SUSAN MURPHY & another[1] *vs.* I.S.K.CON. OF NEW
ENGLAND, INC.

Norfolk. September 6, 1990. - May 1, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Religion. Constitutional Law*, Freedom of religion. *Parent and Child*, Companionship and society, Interference with parental rights. *Interference with Parental Rights. Emotional Distress. Negligence*, Duty to prevent harm. *Actionable Tort. Corporation*, Religious. *Practice, Civil*, Amendment. *Damages*, Apportionment, Tort.

At the trial of various tort claims by a mother and her daughter against an incorporated religious organization, including claims of intentional infliction of emotional distress and intentional interference with the parent-child relationship allegedly resulting from the daughter's membership, while a minor, in the defendant's religious community, it was prejudical error and an infringement of the defendant's constitutional right to practice its religion for the judge to permit the plaintiff to place in evidence certain passages from the defendant's spiritual texts and thereby suggest to the jury that mere exposure to the defendant's beliefs was sufficient to cause tortious emotional damage and separate the daughter from her mother [849-857]; where the claims of intentional infliction of emotional distress could not stand without evidence of the defendant's religious beliefs, judgment on those claims was to be entered for the defendant [859].

At the trial of various tort claims by a mother and her daughter against an incorporated religious organization, alleging harm resulting from the daughter's membership, while a minor, in the defendant's religious community, the judge erred by suggesting to the jury that the constitutional protection of the free exercise of religion does not extend to activity constituting the torts of intentional infliction of emotional distress or intentional interference with parental rights. [857-859]

This court acknowledged the tort of intentional interference with the parent-child relationship as a contemporary expression encompassing actions for abduction, enticement, harboring, and secreting a minor child from the parent having legal custody. [859-861]

[1] Mary Murphy.

Discussion of the elements of the tort of intentional interference with the parent-child relationship, and the basis for a parent's recovery of damages. [861-863]

In a civil action, the judge acted within his discretion in denying the plaintiffs' motion for leave to amend their complaint to add claims for allegedly tortious activities arising prior to the defendant's incorporation. [863-864]

In a civil action, the judge properly limited the plaintiffs' recovery to injuries they suffered after the defendant's incorporation. [865-866]

CIVIL ACTION commenced in the Superior Court on April 19, 1977.

The case was tried before *Robert W. Banks*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*David Kelston (David Liberman* of California, with him) for the defendant.

*James A. Frieden* for Susan Murphy.

*Mary John Boylan (Francis J. O'Rourke* with her) for Mary Murphy.

*David A. Hoffman & John Reinstein*, for Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

LIACOS, C.J. On June 16, 1987, a jury awarded $610,000 to the plaintiffs Susan Murphy and her mother, Mary Murphy, for damages arising out of their involvement with the defendant, I.S.K.Con. of New England, Inc. (ISKCON N.E.). The defendant now appeals claiming that the trial below constituted a "heresy trial" and that the jury's verdicts against the defendant represent an impermissible restraint on ISKCON N.E.'s right to practice freely its religion. The defendant argues that one of the plaintiffs' claims, for intentional interference with parental rights, does not exist under the common law of the Commonwealth. The defendant also alleges that the plaintiffs did not present sufficient evidence to meet their burden of proof on their tort claims and that the verdicts are invalid due to the judge's erroneous jury instructions. Finally, the defendant claims that the trial judge improperly deprived ISKCON N.E. of the protection of a

statutory liability limit of $20,000 for charitable organizations. Based on our review of the record, we conclude that the trial below impermissibly infringed on the defendant's right to practice freely its religion. Accordingly, we vacate the judgments against the defendant for the counts of intentional infliction of emotional distress, and order entry of judgment for the defendant on those counts. We remand the case for retrial on the claims of intentional interference with parental rights, breach of a duty of care, and vicarious liability for assault and battery.[2]

1. *Facts.* We present a brief description of the facts the jury could have found, based on the evidence put before it. Additional facts will be discussed in later sections of this opinion as they become relevant to our legal analysis.

This case originated in Randolph in the winter of 1971 when Susan Murphy, then thirteen years old, began to explore the beliefs of the Hare Krishna religion, also referred to as Krishna Consciousness.[3] At this time Susan occasionally attended Sunday feasts at a Krishna temple located in Boston. During the summer of 1972, Susan began to attend the temple more frequently after she became acquainted with Doug Hewer, a nineteen or twenty year old occasional practitioner of Krishna Consciousness. At some point during the fall of 1972, Susan and Doug became girl friend and boy friend.

Susan's mother, Mary Murphy, remained unaware of Susan's interest in Krishna Consciousness or her attendance at the Boston Krishna temple until February or March, 1973. Mary forbade Susan from visiting the temple again, but Susan continued to attend the temple without informing her mother.

---

[2]In light of our disposition of the various claims of error, and our order for retrial of some of the plaintiffs' claims, we do not reach the issue of limitation of liability.

[3]The religious status of Krishna Consciousness or ISKCON N.E. was not at issue in the trial below. The plaintiffs stipulated that Krishna Consciousness is an established religion and that ISKCON N.E. is a religious organization sincerely dedicated to the ideals of Krishna Consciousness.

In February, 1973, Susan and Doug met with Vishnu-Jana, a Krishna sannyasi, or swami,[4] to discuss Susan's desire to become "Krishna conscious" by living according to the principles of Krishna Consciousness. Susan also told Vishnu-Jana of her mother's unwillingness to allow Susan to attend the Boston temple. Vishnu-Jana told Susan and Doug that the most important goal for Susan was to become Krishna conscious, and that she should do what was necessary to attain that goal. After the meeting, Susan and Doug considered themselves married to each other by the power of Vishnu-Jana's advice. From then on, they presented themselves as a married couple, with Susan wearing traditional Krishna symbols of marriage. At this time, Susan was fourteen years old.

About March, 1973, Susan ran away with Doug to Toronto, Canada, and then to Los Angeles, California. During their travels, Susan and Doug received the assistance and friendship of several Krishna Consciousness practitioners. Susan, after speaking with her mother on the telephone, returned to Massachusetts in the fall of 1973 with Doug and resumed living with her mother. Approximately two months after returning to Massachusetts, Susan and Doug ran away again to Toronto. From Toronto, Susan and Doug traveled to Los Angeles, where they remained for several months. During this time, Susan and Doug regularly visited a Krishna temple in Los Angeles. Susan and Doug then moved to Hawaii until late 1973 or early 1974, when they returned to Massachusetts and took up residence together. Several weeks after their return to Massachusetts, Susan and Doug left once again for Los Angeles. They remained in Los Angeles for several weeks before traveling to Pittsburgh, Pennsylvania, where they resided in a local Krishna temple.

The defendant ISKCON N.E. was incorporated in Massachusetts on February 19, 1974. Some time during the sum-

---

[4]In the Krishna Consciousness religion, a "swami" is a spiritual authority.

mer of 1974, Susan returned to Massachusetts with Doug to assist Mary in certain legal proceedings unrelated to the present case. For one month Susan and Doug lived together in a rented room. They then moved into the apartment of Traidas and Pramada, members of ISKCON N.E.'s temple. Susan testified that at this time Traidas was the president of the temple. Susan attended the defendant's temple and participated regularly in temple activities. On August 14, 1974, Susan celebrated her sixteenth birthday.

Around September, 1974, Susan and Doug moved into the apartment of Carol and Larry DeGregory, two other members of ISKCON N.E.'s temple. Evidence indicated that Larry was the temple's treasurer. In November, 1974, after moving to another apartment, the two couples requested permission from the temple's president, Adi Kesava, to move into the defendant's temple. Adi Kesava told Susan that she could live in the temple only with her mother's permission, and only if Susan would adhere to the Krishna practices of a vegetarian diet, no illicit sex, no intoxicants, no gambling, and regular participation in temple activity. Susan agreed to these conditions and arranged for Adi Kesava to speak with Mary Murphy who, on certain conditions, consented to Susan's living in the temple.

In November, 1974, Susan and Doug moved into ISKCON N.E.'s temple. Susan slept in the women's quarters; Doug slept in the men's quarters. Doug left the temple shortly thereafter, apparently in response to a disagreement with Susan regarding her desire to remain celibate in accordance with Krishna principles. After Doug left the temple, Susan no longer considered herself married to him. During her stay in the temple, Susan participated regularly in chores, rituals, and classes associated with the temple and the practice of Krishna Consciousness. This continued until December, 1974, or January, 1975, when Mary asked Susan to sleep at home on weekends. Susan agreed, but continued to spend most of her time at the temple. Shortly after Susan was formally initiated as a Krishna Consciousness "devotee" in January or February, 1975, Susan began spending every

night at Mary's house, although she continued to spend her days at the temple.

In April, 1975, Mary discovered a letter written by Susan which alluded to a "plan" by several members of the defendant's temple to send Susan to West Germany without Mary's knowledge or permission. At this point, Mary telephoned the Weymouth police department and spoke with Officer Henry Vanasse, who agreed to speak to Susan. Mary telephoned Susan at the temple and asked Susan to come home on the pretext that Mary was ill. When Susan arrived, Mary told her that she could not go back to the temple. A brief struggle ensued, but Mary was able to restrain Susan until Officer Vanasse arrived. He informed Susan that she risked legal action against her if she continued to run away. Mary demanded that Susan sever all ties with the defendant's temple, to which Susan reluctantly agreed.

Evidence was presented regarding Susan's emotional condition after her withdrawal from the defendant's temple. This evidence showed that Susan remained quite angry with her mother for several months, and that Susan expressed a desire to return to the temple. Susan and Mary's relationship began to improve after approximately six months when Susan decided that she no longer wanted to associate with the temple or its members. Additional evidence was presented which, the plaintiffs claimed, established that Susan's experience with the defendant caused Susan to experience "post-traumatic stress disorder," a low sense of self-esteem, and an inability to maintain a healthy relationship with men.

On April 19, 1977, Susan and Mary filed a complaint in the Superior Court alleging nine counts of tortious activity against (1) ISKCON N.E., (2) ISKCON, a Krishna temple located in California, and (3) A.C. Bhaktivedanta Swami Prabhupada, the founder of Krishna Consciousness in the United States. The plaintiffs sought $2,500,000 as compensation for their alleged injuries. The defendants filed motions to dismiss the complaint, which were referred to a special master. Following the master's report, the plaintiffs amended their complaint to substitute a Krishna temple in New York

for the California temple, to delete one of the nine causes of action, and to lower the damages sought to $1,000,000.

In April, 1985, the California temple moved to adopt the master's report and to dismiss the California temple from the case. This motion was allowed. The court also allowed a motion to dismiss the complaint against A.C. Bhaktivedanta Swami Prabhupada. In addition, the court dismissed the complaint against the New York temple.

ISKCON N.E. moved for summary judgment as to each count in the plaintiffs' amended complaint. After a hearing, the judge granted summary judgment for the defendant on Susan's claim of false imprisonment, Susan's claim of fraud on the part of ISKCON N.E., and Mary's claim of seduction. The case proceeded to trial on May 11, 1987, on the following counts: (1) Susan's claim that ISKCON N.E. failed in its duty to provide adequately for her welfare while she was under its care; (2) Susan's claim that ISKCON N.E. aided and abetted Doug Hewer in committing assault and battery on her by way of nonconsensual sexual intercourse; (3) Susan's claim of intentional infliction of emotional distress; (4) Mary's claim of intentional infliction of emotional distress; (5) Susan's claim of intentional interference with the Murphy family structure; and (6) Mary's claim of intentional interference with the Murphy family structure. The judge limited the defendant's potential liability to its actions for the period between ISKCON N.E.'s incorporation and Susan's departure from the temple. Following the plaintiffs' presentation of evidence, the defendant moved for a directed verdict on all counts. The court dismissed Susan's claim of intentional interference with the Murphy family structure, but otherwise denied the motion. The defendant's motion for directed verdict at the close of all the evidence was also denied.

On June 16, 1987, the jury found for the plaintiffs on all remaining counts. The jury awarded Susan $210,000 for the intentional infliction of emotional distress, and $30,000 for ISKCON N.E.'s failure to provide for her welfare, $10,000 of which was attributable to ISKCON N.E.'s failure to pro-

tect her from assault and battery by third persons. Mary received $350,000 for the intentional infliction of emotional distress, and $20,000 for the intentional interference with her parental rights. The defendant's motions for new trial and for judgment notwithstanding the verdict were denied. The defendant filed a notice of appeal. We took the case on our own motion.[5]

2. *The free exercise of religious rights.*[6] ISKCON N.E. claims that the jury's verdicts must be struck down as a violation of both State and Federal guarantees of the free exercise of religion.[7] In support of its argument, the defendant points to the fact that the plaintiffs presented substantial and detailed evidence regarding ISKCON N.E.'s religion. The defendant claims that the introduction of this evidence allowed the jury to punish ISKCON N.E. for the content of its unorthodox religious beliefs through the imposition of tort liability, thereby depriving ISKCON N.E. of its constitutional right to practice freely its religion. In the unique circumstances of this case, we agree with the defendant.

In considering ISKCON N.E.'s free exercise claim, we recognize our duty to conduct an independent review of the record of the trial below. "[I]n cases raising First Amendment issues [the United States Supreme Court has] repeatedly held that an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression'." *Bose Corp.* v. *Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984), quoting *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 284-286

[5]The plaintiffs have filed a cross appeal regarding certain rulings of the trial judge. See section 4 *infra.*

[6]We acknowledge with appreciation the amicus brief submitted by the Civil Liberties Union of Massachusetts.

[7]Although the defendant cites art. 2 of the Massachusetts Declaration of Rights, the arguments in its brief to this court are based on a discussion of the rights of free exercise granted under the First Amendment to the United States Constitution. Accordingly, we shall confine our consideration of the defendant's claims to the context of the First Amendment.

(1964). See *Gaudiya Vaishnava Soc'y* v. *San Francisco*, 900 F.2d 1369, 1373 (9th Cir. 1990) ("We conduct an independent review of the record to be sure that 'the speech in question actually falls within the protected category,' and to determine whether the constitutional factors have properly been applied"). Furthermore, in examining the record below, we recognize that, "where a jury's general verdict *may* have rested upon grounds improper for First Amendment reasons, a reviewing court will not pause to speculate whether the jury's verdict was actually reached on other, and permissible, grounds" (emphasis in original). *Founding Church of Scientology* v. *United States*, 409 F.2d 1146, 1164 (D.C. Cir.) (per curiam), cert. denied, 396 U.S. 963 (1969). See *Gregory* v. *Chicago*, 394 U.S. 111, 113 (1969); *Stromberg* v. *California*, 283 U.S. 359, 367-368 (1931).

The First Amendment to the United States Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The courts of both the United States and this Commonwealth are required to ensure that individuals or organizations are not unjustly deprived of their right to exercise freely their religious beliefs. See, e.g., *Cantwell* v. *Connecticut*, 310 U.S. 296 (1940) (breach of the peace conviction of a Jehovah's Witness overturned as a violation of First Amendment free exercise clause); *Madsen* v. *Erwin*, 395 Mass. 715, 724 (1985) (civil rights and contract claims by lesbian employee against the First Church of Christ, Scientist dismissed as a violation of First Amendment free exercise clause). We have recognized previously that the imposition of tort liability for conduct that is allegedly connected to religious belief, such as is involved in the present case, presents a sufficient potential deprivation of religious freedom to warrant constitutional scrutiny. See *Alberts* v. *Devine*, 395 Mass. 59, 74, cert. denied sub nom. *Carroll* v. *Alberts*, 474 U.S. 1013 (1985). See also *Molko* v. *Holy Spirit Ass'n for Unification of World Christianity*, 46 Cal. 3d 1092, 1114 (1988), cert. denied, 490 U.S. 1084 (1989).

Freedom of religion, however, while occupying a "preferred position . . . in the pantheon of constitutional rights," *Madsen* v. *Erwin, supra* at 724, is not absolute. *Commonwealth* v. *Nissenbaum*, 404 Mass. 575, 581 (1989). Both this court and the United States Supreme Court have recognized that the concept of the free exercise of religion involves both belief and activity, and, while the freedom to believe particular religious principles is absolute and may not lawfully be infringed, the freedom to act in response to religious beliefs does not enjoy the same immunity. See *Employment Div., Dept. of Human Resources* v. *Smith*, 494 U.S. 872 (1990); *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 374-377, cert. denied, 459 U.S. 970 (1982). "[The First] Amendment embraces two concepts, — freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Cantwell* v. *Connecticut, supra* at 303-304.

The constitutional difficulty with the basis of the jury's verdicts against ISKCON N.E. lies not in any perceived infringement of the defendant's right to engage in religiously motivated activity, but rather in the risk of infringement of ISKCON N.E.'s right to believe freely in the principles of Krishna Consciousness. This potential for infringement arose when the trial judge allowed in evidence, as the basis of the plaintiffs' claims, certain passages from the scriptural texts of the Krishna Consciousness religion. See *Founding Church of Scientology* v. *United States, supra* at 1164 ("where a jury's general verdict *may* have rested upon grounds improper for First Amendment reasons, a reviewing court will not pause to speculate whether the jury's verdict was actually reached on other, and permissible, grounds" [emphasis in original]).

Susan was permitted to read scriptural passages aloud to the jury and to testify as to what she had learned at the temple regarding this material. Of particular concern is Susan's testimony regarding scriptural text which pertained to the role of women and of family in the Krishna Consciousness

religion. In regard to the plaintiffs' claim of intentional inflic-
tion of emotional distress, the defendant refers to sections of
the trial transcript in which Susan testified that she learned,
in reference to particular scriptural passages, that: (1)
"women are inferior to men"; (2) "the female form is the
form of evil"; and (3) "one should be very careful to cover
the body so that men are not attracted to [women]."[8] The
defendant also claims that this testimony formed the basis of
the opinion of the plaintiffs' expert psychiatric witness that
Susan suffered from "post-traumatic stress disorder" from
her "experience in the Hare Krishna movement."

In regard to the plaintiff's claim of intentional interference
with parental rights, the defendant points to Susan's testi-
mony that she learned from particular scriptural passages
and prayers that: (1) the earthly family was a perversion of
the Krishna family; (2) the earthly family was "inconve-
nient" and "nonexistent"; (3) "in the span of eternity, [her]
life was nothing, and that [her] relationships with [her] fam-
ily and friends were nothing only if [she] could make them
Krishna conscious"; and (4) "our families in this life are not
our real families . . . [t]hey are just an entanglement in the
material world."

The defendant also points to the fact that Susan was al-
lowed to read to the jury a scriptural passage, which she had
been told to believe literally, about an incarnation of Krishna
coming to Earth to kill violently a parent opposed to his
child's participation in the Krishna religion.[9] The defendant

---

[8]Our review of the record in this case reveals that Susan also testified
that she learned from the study of certain scriptural texts that: (1) "it is
better for a woman to have to bear a son and that female children are not
as good as male children"; (2) "[women] should always consult a higher
person before making any type of decision because women are less intelli-
gent than men"; and (3) "the woman has no position which is independent
of man and she should take her husband as her spiritual authority.".

[9]The defendant also points to substantial other testimony offered by the
plaintiffs, such as ISKCON N.E.'s worship of certain plants and offerings
of food to temple deities, as providing additional opportunities for the jury
to punish ISKCON N.E. for its unorthodox religious beliefs. Because we
conclude that the presentation of the scriptural testimony we have de-

claims that the plaintiffs utilized this testimony to support their claim that ISKCON N.E. had intentionally sought to separate Susan from her mother. The defendant argues that, because the plaintiffs' claims of intentional infliction of emotional distress and intentional interference with parental rights found their basis in the content of the teachings of ISKCON N.E.'s religion, the litigation of these claims allowed the jury to penalize ISKCON N.E. for its adherence to unpopular religious beliefs.

The plaintiffs do not deny that Susan's testimony allowed the jury to consider the content of the defendant's religious scriptures. Indeed, in their brief to this court, the plaintiffs note that "[s]ome of the plaintiffs' damages flow from the religious beliefs and practices to which Susan Murphy was exposed while she was a member of the Defendant's religious community." The plaintiffs suggest, however, that Susan's claim is not based on the defendant's religious beliefs per se, but rather on ISKCON N.E.'s actions of teaching those beliefs to Susan. This religious activity, they argue, unlike religious belief, may be regulated through tort liability without violating the defendant's right to the free exercise of its religion. See, e.g., *Alberts* v. *Devine*, 395 Mass. 59, 74, cert. denied sub nom. *Carroll* v. *Alberts*, 474 U.S. 1013 (1985) (First Amendment free exercise clause does not bar imposition of tort liability for religiously motivated activity which amounts to a breach of physician-patient confidentiality).

As we have already noted, religiously motivated activity is not categorically immunized from tort liability by the free exercise clause of the First Amendment. However, we are of the view that the plaintiffs' attempt to characterize the disputed testimony as relating to the defendant's religious activity rather than its religious belief is unpersuasive. The essence of what occurred in the trial is that the plaintiffs were allowed to suggest to the jury extensively that exposure to the defendant's religious beliefs was sufficient to cause tor-

---

scribed above was sufficient to endanger the defendant's free exercise rights, we need not address the effect of this other evidence.

tious emotional damage and to separate Susan from her mother. Our conclusion in this regard is supported by the words of the judge who, in allowing the disputed scriptural testimony, instructed the jury that "[this testimony is] being placed before you for you to determine whether or not such information was brought to [Susan's] attention and how if at all it affected her or caused her to act, or not to act, or [whether] other persons were [caused] to act in certain ways."[10] In his closing argument to the jury the plaintiffs' counsel stated that "Susan was subjected at an early age to destructive teachings, teachings that were destructive to her personality, to her psyche, and Doctors Zinberg and Norberg and Carroll (the plaintiffs' expert witnesses) testified to this, and she suffers from it today."

"Freedom of thought, which includes freedom of religious belief, is basic in a society of free men. . . . It embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faiths. Heresy trials are foreign to our Constitution." (Citation omitted.) *United States* v. *Ballard,* 322 U.S. 78, 86 (1944). In recognition of our nation's commitment to freedom of religious belief, it has become axiomatic that "[c]ourts cannot question the verity of religious doctrines or beliefs." *Madsen* v. *Erwin,* 395 Mass. 715, 722 (1985). "Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs." *United States* v. *Ballard, supra* at 86. Yet, in the present case, the defendant has been required to do what the First Amendment has forbidden; it been forced to attempt to prove to a jury that the substance of its religious beliefs is worthy of respect.

---

[10]In a sidebar conference regarding the form in which the scriptural text could be presented to the jury, the judge stated that, "[i]f [Susan] would like to testify as to certain passages that were taught to her, which she recalls, and which will later be testified to as bearing upon emotional distress, or psychological impact, or psychological damage, then they are admissible as being relevant."

Inherent in the claim that exposure to ISKCON N.E.'s religious beliefs causes tortious emotional damage is the notion that the disputed beliefs are fundamentally flawed and inconsistent with a proper notion of human development. While this issue may be the subject of a theological or academic debate, it has no place in the courts of this Commonwealth. In a similar manner, the issue whether the Krishna Consciousness religion adheres to an appropriate vision of the family is not for the courts to decide. The defendant cannot be forced to choose between censoring its religious scriptures to remove material which may be offensive to contemporary society and paying tort damages for the privilege of maintaining unpopular religious beliefs. "Intangible or emotional harms cannot ordinarily serve as a basis for maintaining a tort cause of action against a church for its practices — or against its members. . . . Offense to someone's sensibilities resulting from religious conduct is simply not actionable in tort. . . . Without society's tolerance of offenses to sensibility, the protection of religious differences mandated by the first amendment would be meaningless." (Citation omitted.) *Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 883 (9th Cir.), cert. denied, 484 U.S. 926 (1987). See *Madsen* v. *Erwin, supra* at 725 (requiring defendants to pay damages to maintain their religious beliefs would substantially burden the defendants' right to free exercise of religion). "Tolerance of the unorthodox and unpopular is the bellwether of a society's spiritual strength. A community sufficiently confident of its moral and political underpinnings trusts its members to employ reasoned and considered judgment in evaluating novel theories that seek to explain the meaning and purpose of life. The coercive mechanisms of restraint, violence, and suppression are not required to confront strange ideologies and unfamiliar rituals, however obnoxious they may be. This freedom to explore diverse political and religious doctrines, derived from the establishment and free exercise clauses of the First Amendment, permits our citizens to follow the dictates of conscience. By fostering this voluntarism, our nation is strengthened, for the people respect a gov-

ernment that treats its charges as free-willed, discerning moral beings. Our republic prides itself on the enormous diversity of religious and political beliefs which have been able to find acceptance and toleration on our shores." *International Soc'y for Krishna Consciousness, Inc.* v. *Barber*, 650 F.2d 430, 432 (2d Cir. 1981).

The plaintiffs argue that the fact that ISKCON N.E. exposed Susan to the disputed teachings while she was a minor should persuade this court to deny the defendant's free exercise claim. In *Prince* v. *Massachusetts*, 321 U.S. 158, 167-170 (1944), the United States Supreme Court recognized that a State has greater leeway under the First Amendment to infringe on religious activity involving children than it does on religious activity which involves only adults. In upholding the enforcement of a Massachusetts child labor law which prevented proselytizing activity by children of Jehovah's Witnesses, the Court stated that "[t]he state's authority over children's activities is broader than over like actions of adults. . . . What may be wholly permissible for adults . . . may not be so for children . . . ." *Id.* at 168-169.

While we agree with the plaintiffs that Susan's minority is of constitutional significance, we are not persuaded that her age alleviates the free exercise concerns raised by the jury's evaluation of the defendant's religious beliefs. The fact that Susan was a minor when she was involved with the defendant may lessen the degree of constitutional protection which ISKCON N.E. has against a claim of an intentional tort based on religiously motivated activity. However, the nature of the challenge to the defendant's religious beliefs posed by the disputed scriptural testimony in the present case embroils the court in an assessment of the propriety of those beliefs regardless of the age of the plaintiffs. This court may not engage in such deliberations. See *Molko* v. *Holy Spirit Ass'n for the Unification of World Christianity*, 46 Cal. 3d 1092, 1120 (1988), cert. denied, 490 U.S. 1084 (1989) (court will

not consider threats of divine retribution as basis for claim of intentional infliction of emotional distress).[11]

Additionally, by allowing the jury inappropriately to consider constitutionally protected religious beliefs in determining the defendant's liability, the judge also exacerbated the problem by erroneously instructing the jury regarding the extent of the free exercise protections afforded by the First Amendment. The judge instructed the jury that "[t]he tort of intentional infliction of emotional distress is not protected by the umbrella of the First Amendment. The tort of intentional interference with parental custody is not protected by the shield of the First Amendment." This instruction does not accurately reflect applicable constitutional law and may have invited the jury to ignore the defendant's free exercise rights in determining ISKCON N.E.'s tort liability.[12]

Both this court and other courts have recognized that the free exercise protection provided by the First Amendment is not automatically withheld from activity which constitutes an intentional tort. The decision whether the free exercise clause bars a particular tort action is not necessarily determined by the presence of tortious activity but by other factors such as the nature of the evidence which must be presented to support such a claim, or the effect that liability for a successful

---

[11]Our conclusion on this point also is influenced by the fact that the religious scriptures were taught to Susan at regularly scheduled temple meetings. "[It is not] in the competence of courts under our constitutional scheme to approve, disapprove, classify, regulate, or in any manner control sermons delivered at religious meetings." *Fowler* v. *Rhode Island*, 345 U.S. 67, 70 (1953).

[12]The plaintiffs claim that the defendant failed to object properly to the judge's charge to the jury and therefore must be considered to have waived any objection in that regard. We disagree. Our review of the record indicates that the defendant objected specifically to the judge's charge that the torts alleged by the plaintiffs were not conduct protected by the First Amendment. Furthermore, regardless of the propriety of the defendant's objections to the charge, "a denial of First Amendment rights is one of those exceptional instances where an appellate court will notice error in the charge even where no objection is made at trial." *Founding Church of Scientology* v. *United States*, 409 F.2d 1146, 1164 n.2 (D.C. Cir.) (per curiam), cert. denied, 396 U.S. 963 (1969).

claim would have on free exercise rights. In *Madsen* v. *Erwin, supra,* for example, this court held that, due to the nature of the evidence on which the plaintiff intended to support her claims, which included the intentional infliction of emotional distress, the free exercise clause of the First Amendment required that summary judgment be granted for the defendant religious organization. "[L]itigation [of the plaintiff's claims] would involve the court in a review of an essentially ecclesiastical procedure . . . . That is impermissible under the First Amendment." *Id.* at 724.

Other courts have extended free exercise protection to bar recovery for intentionally tortious activity. In *Paul* v. *Watchtower Bible & Tract Soc'y of N.Y., Inc., supra* at 879-883, the United States Court of Appeals for the Ninth Circuit held that the First Amendment free exercise clause provided a complete defense to claims of outrageous conduct, defamation, invasion of privacy, and fraud. The court noted that free exercise concerns barred recovery despite the "real and not insubstantial" harms suffered by the plaintiff at the hands of the defendant religious organization. *Id.* at 883. And in *Molko* v. *Holy Spirit Ass'n for Unification of World Christianity, supra* at 1120, the Supreme Court of California held that claims of intentional infliction of emotional distress are barred by the First Amendment to the extent they are based on protected religious speech. See also *Van Schaick* v. *Church of Scientology of Cal., Inc.,* 535 F. Supp. 1125, 1142 (D. Mass. 1982) (noting that if essential element of plaintiff's fraud claim rests on alleged falsity of constitutionally protected religious statements the tort claim must fail); *Miller* v. *Catholic Diocese of Great Falls,* 224 Mont. 113, 118 (1986) (tort of bad faith in employment barred by the free exercise clauses of United States and Montana Constitutions). See generally Annot., Liability of Religious Association for Damages for Intentionally Tortious Conduct in Recruitment, Indoctrination, or Related Activity, 40 A.L.R.4th 1062 (1985); Esbeck, Tort Claims Against Churches and Ecclesiastical Officers: The First Amendment Considerations, 89 W. Va. L. Rev. 1 (1986). The judge's instructions in the

present case, to disregard the requirements of the First Amendment regarding liability for intentionally tortious activity, were error.

The trial judge should have allowed the defendant's motion for judgment notwithstanding the verdicts on Mary's and Susan's claims of intentional infliction of emotional distress. Those claims could not stand in the absence of testimony regarding ISKCON N.E.'s religious beliefs. On retrial, damages alleged by Susan and Mary based on allegations of intentional infliction of emotional distress may be considered to the extent that such damages are an element of the claims of physical and sexual abuse of Susan. Mary's claim of intentional interference with parental rights, discussed *infra*, also may be considered on retrial.[13]

3. *Issues on retrial*. We are constrained from answering definitively the defendant's arguments regarding the claims of breach of a duty of care and vicarious liability due to the difficulty in separating out consideration of the defendant's constitutionally protected religious beliefs from conditionally protected religious activity and from conduct outside the scope of constitutional scrutiny.[14] We remand those claims without further discussion. We address the defendant's contention that the tort of intentional interference with parental rights is not recognized in this Commonwealth, *infra*, and remand that claim for retrial as well.

"The common law has traditionally recognized a parent's interest in freedom from tortious conduct harming his relationship with his child," *Ferriter* v. *Daniel O'Connell's Sons*, 381 Mass. 507, 512 (1980), and the parent "may be compensated therefor when there is interference with the normal

---

[13]We reverse the judgments against the defendant for the counts of vicarious liability for assault and battery and breach of a duty of care because, while the evidence regarding the defendant's religious beliefs admitted at trial did not bear directly on these issues, the possibility exists that the evidence may have infected the jury's consideration of these claims.

[14]We note that the essence of the assault and battery claim is conduct by Doug Hewer, not religiously motivated and not entitled to constitutional protection.

parent-child relationship." *Norman* v. *Massachusetts Bay Transp. Auth.*, 403 Mass. 303, 311 (1988) (Liacos, J., dissenting on other grounds).[15] The tortious conduct referred to in *Ferriter* and *Norman* includes the abduction, enticement, and harboring and secreting of minor children from their parents, or in other words, the intentional interference with parental interests or rights. The elements of these causes of action are well established. Abduction is the physical taking of a minor child from the parent having legal custody. See *Rice* v. *Nickerson*, 9 Allen 478 (1864). An action for enticement will lie where one, through an "active and wrongful effort" and knowing that the parent does not consent, induces a child to leave the parent's home. *Butterfield* v. *Ashley*, 6 Cush. 249, 250-251 (1850).[16] One "harbors" a minor child by inducing or encouraging a child, who is away from the parent without the parent's consent, to remain away from the parent. See *Stowe* v. *Heywood*, 7 Allen 118 (1863). Liability for harboring a child will not be found, however, unless the actor knows or has reason to know that the child is away from the parent without the parent's consent. See W. Prosser & W. Keeton, Torts § 124, at 925 (5th ed. 1984). Implicit in each action is the requirement that the child be physically absent from the home for a continuous period of time. To allow recovery for interference with parental interests without physical absence of the minor child from the home would be to allow an action for alienation of affections, for which recovery cannot be had. See *Ronan* v. *Briggs*, 351 Mass. 700 (1966).[17]

---

[15]A natural parent may have what amounts to a liberty interest in the relationship between parent and child, and in controlling the child's education and upbringing, where the parent has committed herself to the personal, financial, and custodial responsibilities associated with raising the child. See *Hodgson* v. *Minnesota*, 110 S. Ct. 2926, 2942 (1990).

[16]A Missouri court has held that the actor must "knowingly and designedly decoy[]" the minor child from the home. *Kipper* v. *Vokolek*, 546 S.W.2d 521, 525 (Mo. Ct. App. 1977). Mere persuasion is not enough. See *Meikle* v. *Van Biber*, 745 S.W.2d 714, 716 (Mo. Ct. App. 1987).

[17]The trial judge in the present case instructed the jury that liability may be found where an actor "compels or induces a minor child to leave

The Restatement (Second) of Torts § 700 (1977) encompasses all of the actions described above: "One who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has [ ] left him, is subject to liability to the parent."[18] Jurisdictions recognizing the tort of intentional interference with parental rights as such define it in accord with Restatement (Second) of Torts § 700, and the case law of those jurisdictions is consistent with the case law of this Commonwealth. See, e.g., *Surina* v. *Lucey*, 168 Cal. App. 3d 539 (1985) (interference with parental rights based on § 700 for abduction and enticement); *D & D Fuller CATV Const., Inc.* v. *Pace*, 780 P.2d 520 (Colo. 1989) (recognizing tort of interference with parent-child relationship as set forth in § 700); *Plante* v. *Engel*, 124 N.H. 213 (1983) (liability for aiding and abetting intentional interference with custodial parent's rights based on State constitution and § 700). But see *Larson* v. *Dunn*, 460 N.W.2d 39 (Minn. 1990) (in context of custody dispute, court refused to recognize tort as not in best interest of child). We therefore acknowledge the tort of intentional interference with the parent-child relationship as a contemporary expression encompassing actions for abduction, enticement, harboring, and secreting of a minor child from the parent having legal custody.

One crucial element of the tort of intentional interference with the parent-child relationship is the lack of parental consent to the child's absence from the home. A jury should con-

---

*or defy the authority of* the parent legally entitled to its custody" (emphasis added). Induced defiance of parental authority, without physical absence of the minor child from the home, is not enough to establish liability under this tort.

[18]An action may not be maintained against a person who simply provides the child with shelter and sustenance. See Restatement (Second) of Torts § 700 comment a. Further, it is a defense that a person acts to rescue the child "from physical violence inflicted by the parent in excess of his parental privilege," or that a person is authorized by law and acts within the scope of that authority to remove a child from an improper home. Restatement (Second) of Torts § 700 comment e (privileges to act).

sider, among other things, what actions and events led to the child's absence from the home, and what actions the parent took to return the child to the home, including the degree of effort or persistence exerted by the parent in obtaining legal assistance. In addition, the jury should consider what actions, if any, the defendant may have taken to obtain the parent's consent, either in good faith, or through fraud or duress. Of course, if consent is obtained by fraud or duress, there is no consent.

The early interference actions permitted recovery for damages based primarily on the parent's loss of the child's services, although *Stowe v. Heywood, supra* at 122, recognized damages for loss of society as well, and was cited in *Norman v. Massachusetts Bay Transp. Auth., supra* at 307, as an early example of cases allowing recovery for loss of a child's consortium due to the defendant's intentional acts. We have had no occasion to address these particular tort actions in light of the move away from the loss of services as the primary basis for recovery for intentional acts which harm familial relations. See *Diaz v. Eli Lilly & Co.*, 364 Mass. 153, 154-161 (1973) (tracing evolution of spousal claims from loss of services to loss of consortium).[19] This court has come to recognize, however, that the actual basis of recovery for intentional tortious acts which interfere with a parent-child relationship is the loss of filial consortium. See *Ferriter v. Daniel O'Connell's Sons, supra* at 510-512. In addition to compensation for loss of filial consortium and services, a parent may obtain damages for the cost of recovering the child, *Rice v. Nickerson, supra* at 481,[20] as well as for "mental suffering" or emotional distress which results from the interference. *Stowe v. Heywood, supra* at 119, 122. See Restatement (Second) of Torts § 700 comment g. See also *Surina v.*

---

[19]Damages incurred as a result of the loss of a child's services are recoverable, but they are not a necessary element of a cause of action. Restatement (Second) of Torts § 700 comment d.

[20]Restatement (Second) of Torts § 700 comment g indicates that reasonable expenses incurred in treatment of the child for illness or other bodily harm resulting from the defendant's actions are also recoverable.

*Lucey, supra* at 544. But see *Plante* v. *Engel, supra* at 217 (intentional infliction of emotional distress treated as separate cause of action).[21]

4. *Plaintiffs' cross-appeal.* In light of our decision to vacate the jury's verdicts, it becomes necessary to address the plaintiffs' cross-appeal. The plaintiffs claim that: (1) the judge erred in instructing the jury that the defendant could not be held liable for the allegedly tortious activity of certain individuals and groups which occurred before ISKCON N.E.'s incorporation; (2) the judge improperly applied the applicable statute of limitations to Mary's claims; and (3) regardless of ISKCON N.E.'s connection to any individual or group engaged in allegedly tortious preincorporation activity, the defendant must be held liable for all of the damage suffered by the plaintiffs because their injury cannot be apportioned. We address each claim in turn.

a. *ISKCON N.E.'s liability for preincorporation activity.* As we have already noted, the defendant filed motions to dismiss the plaintiffs' original complaint which were referred to a special master on June 16, 1978. The special master issued a report which recommended, in part, that ISKCON N.E. not be held liable for claims arising prior to its incorporation. On February 10, 1986, the defendant moved to adopt this section of the master's report. After hearing, the court allowed this motion on February 27, 1986.

On May 1, 1986, the plaintiffs moved to amend their complaint to charge ISKCON N.E. with liability for activity preceding its incorporation. The plaintiffs claimed that the defendant, in both its preincorporation and corporate form, had acted in concert with other practitioners of Krishna Consciousness to inflict tortious emotional injury on the plaintiffs. The judge denied the motion on August 7, 1986, based on his findings of undue delay on the part of the plaintiffs, undue

---

[21]We note that although the trial judge in the present case allowed separate claims of interference with parental rights and intentional infliction of emotional distress to go to the jury, the judge's instructions eliminated the element of emotional distress from the interference claim, avoiding the possibility of duplicative damages.

prejudice to the defendant, and the legal futility of the plaintiffs' proposed amendment. The judge later allowed the plaintiffs to introduce evidence of preincorporation activity for the limited purposes of providing background information for the jury and, if necessary, for assessing damages.

The decision to grant a motion to amend a complaint, while generally "freely given when justice so requires", Mass. R. Civ. P. 15 (a), 365 Mass. 761 (1974), lies within the broad discretion of a trial judge. *Cappuccio* v. *Zoning Bd. of Appeals of Spencer*, 398 Mass. 304, 314 (1986). This court has previously noted that a judge who, as in the present case, denies a motion to amend due to undue delay or undue prejudice is acting within his discretion. *Castellucci* v. *United States Fidelity & Guar. Co.*, 372 Mass. 288, 291-292 (1977). On appeal, the plaintiffs, who fail to mention that their motion was denied on grounds of undue delay and prejudice, provide us with no reason to believe that the judge abused his discretion. The plaintiffs have limited their argument to the strength of their legal claim that the defendant should be held liable for allegedly tortious preincorporation activity. Even assuming that the plaintiffs are correct in their claim that the defendant legally could be held responsible for the preincorporation activity, the judge acted well within his discretion in denying the plaintiffs' motion on the grounds of undue delay and prejudice. See *Castellucci* v. *United States Fidelity & Guar. Co.*, *supra* at 291-292. The plaintiffs were not entitled to advance to the jury their claim that ISKCON N.E. is liable for the allegedly tortious preincorporation activity of others.

b. *Statute of limitations.* The judge ruled that the applicable statute of limitations prevented Mary from basing any part of her claims on allegedly tortious activity occurring before April 19, 1974. In their brief to this court, the plaintiffs concede that if we rule against the plaintiffs on their ability to hold the defendant liable for preincorporation activity, Mary's statute of limitations claim becomes irrelevant because ISKCON N.E. did not become directly involved with Mary until after April 19, 1974. In light of our decision

in section 4(a) of this opinion, therefore, we need not consider the merits of the plaintiffs' statute of limitations argument.

c. *Apportionment of plaintiffs' injury*. At trial, the plaintiffs claimed that the tortious activity for which the defendant was found liable was a continuation of the tortious activity of other Krishna Consciousness practitioners which began prior to ISKCON N.E.'s incorporation. On appeal, the plaintiffs claim that the injuries they suffered were the indivisible product of both this preincorporation activity and the defendant's postincorporation activity. The plaintiffs argue that, regardless of the defendant's connection to any preincorporation tortfeasors, ISKCON N.E. should be held liable for all the damages claimed by the plaintiffs because the plaintiffs have suffered "one massive injury" which cannot be apportioned between preincorporation and postincorporation activity. We disagree.

"Damages may be apportioned among two or more causes if there is a reasonable basis for doing so." *Glicklich* v. *Spievack*, 16 Mass. App. Ct. 488, 497 (1983). See Restatement (Second) of Torts § 433A (1965) ("[d]amages for harm are to be apportioned among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm"). The judge's decision to apportion damages according to the date of the defendant's incorporation appears to us to have been eminently reasonable. Furthermore, contrary to the plaintiffs' assertions, the fact that the jury may have had some difficulty in calculating the exact extent of the intangible emotional harm caused by postincorporation, rather than preincorporation, activity does not render the plaintiffs' injuries indivisible. "There will be obvious difficulties of proof as to the apportionment of certain elements of damages, such as physical and mental suffering and medical expenses, but such difficulties are not insuperable, and it is better to attempt some rough division than to hold one defendant for the wound inflicted by the other." W. Prosser & W. Keeton, Torts § 52, at 345 (5th ed. 1984). See Restatement (Second)

of Torts § 433A, at 435 ("[t]here may be difficulty in the apportionment of some elements of damages, such as the pain and suffering resulting from the two wounds, or the medical expenses, but this does not mean that one defendant must be liable for the distinct harm inflicted by the other"). The limitation on the plaintiffs' recovery from the defendant was proper.

5. *Conclusion.* The plaintiffs' claims were tried by allowing the jury impermissibly to consider the propriety of constitutionally protected religious beliefs. On the counts of intentional infliction of emotional distress, the judgments are vacated and judgment is to enter for the defendant. The remaining claims are remanded for retrial consistent with this opinion.

*So ordered.*