PRESENT:  All the Justices

SAMANTHA COWARD

v.  Record No. 170491

OPINION BY
JUSTICE D. ARTHUR KELSEY
MAY 3, 2018

WELLMONT HEALTH SYSTEM, d/b/a
LONESOME PINE HOSPITAL, ET AL.

FROM THE CIRCUIT COURT OF WISE COUNTY
David B. Carson, Judge Designate

In *Wyatt v. McDermott*, 283 Va. 685, 725 S.E.2d 555 (2012), this Court recognized for

the first time the tort of intentional interference with parental rights.  The present case tests the

limits of this theory of tort liability.  The circuit court sustained several demurrers to Samantha

Coward's complaint,[1] finding that the allegations did not constitute a viable claim as a matter of

law.  We agree.  Our holding in *Wyatt* and the context in which we offered it do not extend to the

factual allegations against the defendants presently on appeal.

I.

Coward makes the following specific factual allegations in support of her claim for

tortious interference with her parental rights.

A.  JANUARY 19-20 — THE HOSPITAL STAY

On January 19, 2016, Coward was 19 years old and delivering her second child.  *See* J.A.

at 48-49.  The complaint states that she was prescribed Percocet, a pain medication, during her

stay and upon her discharge, *see id.* at 49, 53, but does not allege that the medication rendered

her mentally incapacitated.  In the delivery room after the child's birth, Coward "talked about

placing the baby up for adoption."  *Id.* at 50.  In response, she alleges, unnamed employees of the

_____

[1] Coward filed two complaints, an initial complaint and, with leave of court, a "First
Amended Complaint," *see* J.A. at 47-68, which we will refer to simply as the "complaint."

hospital told her that the treating obstetrician, Dr. Jodi A. Turano, had "directed that they give [Coward] a telephone number of someone who wanted to adopt her baby." *Id.* These employees, Coward adds, told her not to "tell anyone about the phone number or about how she got the phone number because 'they' could get in trouble." *Id.* That same day, Coward called the phone number and initiated a conversation with Synthia Hunley ("Hunley") about adopting the child. Hunley said that she and her husband Dennis were interested and would meet with Coward later that day.

At some point on January 19, Coward "asked to see [the child], but was denied the opportunity due to his respiratory distress." *Id.* Dr. Samuel Patton Deel, a doctor of osteopathic medicine employed by Wellmont Medical Associates, Inc., provided pediatric care for the child and directed that the child be transferred to a "neo-natal intensive care unit" at Holston Valley Medical Center approximately 40 miles away in Tennessee. *Id.* at 50-51. Hunley worked as a licensed practical nurse for Dr. Deel. *Id.* at 51. When transferring the child, the "transport team noted no signs of distress in [the child]." *Id.* The child's discharge summary "noted that [Coward] had orally consented to place [the child] up for adoption." *Id.*

Following up on Coward's earlier phone call, Hunley and her husband met with Coward on the evening of January 19 and informed her that they would be willing to adopt the child. Hunley also advised Coward that because marijuana had been found in Coward's urine, "social services would remove the child and place [him] in foster care" if Coward "did not agree to an adoptive placement." *Id.* The complaint does not allege that this information was false. Instead, the complaint acknowledges that on January 19, Coward "verbally agreed to allow the Hunleys to adopt [the child]." *Id.* at 52.

On January 20, Hunley faxed a proposed agreement to the hospital for Coward's review and approval. Coward and the child's biological father reviewed the agreement in her hospital room. Titled "Adoption Agreement," the document provided that both Coward and the biological father agreed to a "termination" of their parental rights and agreed to "assign custody" of the child to the Hunleys "pending finalization of documents with lawyer." *Id.* at 69. Coward and the biological father signed the agreement before two witnesses, as did the Hunleys. The complaint does not allege that Coward was coerced into signing the agreement, that anyone misled her about its meaning, or that she was mentally incapacitated.

## B. JANUARY 21 — THE JDR PETITION & ORDER

While the parties were forming this agreement, the newborn was still a patient at Holston Valley Medical Center. On January 21, Holston Valley Medical Center advised Hunley that without a court order it would have to refer the child's case to the local department of social services ("DSS"). In response, Hunley provided the hospital with the executed Adoption Agreement assigning custody to her and her husband. Hunley then called Coward and asked her to call Holston Valley Medical Center to confirm her intentions. Hunley advised Coward that without a court order the hospital would refer the child's case to DSS, which might spell "trouble" for Coward because DSS would place the child in foster care after discovering that "marijuana was detected" in Coward's urine. *Id.* at 53.

Coward called and advised the hospital, as Hunley had instructed, that the Hunleys had an attorney named Sue Baker and that "as soon as they were able to reach her, the adoption paperwork would be finalized." *Id.* Coward then called Hunley to report on the conversation with the hospital. Coward said that the hospital had informed her that legal counsel would not be necessary if the hospital simply referred the child's case to DSS. Hunley declined the suggestion

3

of involving DSS and, in another telephone conversation moments later, asked Coward and the biological father to go to Baker's office to sign additional legal documents.

Coward and the biological father promptly drove to Baker's office where a staff member read them a Petition and Agreed Order transferring "joint legal" and "sole physical" custody of the child to the Hunleys. *Id.* at 54. Baker assured Coward and the father "that they were 'doing a good thing'" because "the Hunleys were 'good people' and would give [the child] a 'good and happy life.'" *Id.* Coward and the biological father signed the Petition and Agreed Order. The complaint does not allege that either ever voiced any reluctance or objection to executing the documents.

Baker presented the Petition and Agreed Order to the Wise County Juvenile & Domestic Relations District Court ("JDR court") that same day. *See id.* The JDR court entered the order, which provided that "upon agreement of the parties," Coward and the biological father would share "joint legal custody" of the child with the Hunleys and that the Hunleys would have "sole physical custody" of the child. *Id.* at 71-72. The order was endorsed "SEEN AND AGREED" by the Hunleys, Coward, and the biological father. *Id.* at 72. After the JDR court entered the Agreed Order, the Hunleys faxed a copy of it to Holston Valley Medical Center. That afternoon, Hunley "advised [Coward] that a date would be set to finalize the adoption once her lawyer completed the paperwork." *Id.* at 56. Having received a copy of the Agreed Order, Holston Valley Medical Center discharged the child into the Hunleys' physical custody four days later. *See id.* at 56, 101; Appellee's Brief (Wellmont) at 3.

### C. JANUARY 29 — COWARD REVOKES CONSENT

On January 29, 2016, ten days after announcing her interest in placing her child up for adoption and more than a week after executing the Adoption Agreement, Petition, and Agreed

4

Order, Coward announced for the first time that she had changed her mind. She advised Hunley that she "wanted full custody of [the child]." J.A. at 56. Coward alleges that "[i]n response, Synthia Hunley threatened and lied to [Coward]." *Id.* at 57. The complaint, however, identifies no specific threatening statements or misrepresentations. When Coward later asked to visit the child, Hunley "threatened to sue [Coward] for all their expenses and to have her prosecuted for adoption fraud" and stated that Coward should direct further communications to the Hunleys' lawyer. *Id.* After Coward obtained legal counsel, the parties engaged in months of litigation in the JDR court over the custody of the child. The JDR court ultimately awarded Coward exclusive physical custody of the child.

Coward thereafter filed the present lawsuit against Hunley, Dennis Hunley, Baker, and the medical defendants (the Lonesome Pine Hospital, Dr. Turano, and Dr. Turano's medical practice, Wellmont Medical Associates, Inc.). Alleging various predicate tortious acts, Coward claims that each defendant intentionally interfered with her "constitutional right to establish and maintain a parental and custodial relationship" with her newborn child. *See id.* at 58-65.

After all of the defendants demurred to the complaint, the circuit court issued a comprehensive letter opinion overruling Hunley's demurrer and granting the demurrers of all of the remaining defendants. The court found that the complaint stated a prima facie case of tortious interference against Hunley because of the allegations that she had "threatened and used deception to convince [Coward] to give up her baby by telling [Coward] she had marijuana in her urine and that [Hunley] would call social services." *Id.* at 153. The court drew from that allegation the further inference that "Hunley intentionally told the lies to [Coward] in order to adopt the baby." *Id.* Thus, the court concluded, Coward's consent "was obtained by the undue influence" of Hunley and was the product of "fear" and not "free will." *Id.* As for the other

5

defendants, however, the allegations did not allege that they had removed the child from Coward's custody without her consent or had otherwise interfered with her custodial rights. *See id.* at 151-53.

The circuit court entered a Partial Final Judgment allowing Coward to appeal the demurrer rulings in favor of the medical defendants and Baker. Coward does not appeal Dennis Hunley's successful demurrer.[2]

## II.

### A. APPELLATE REVIEW OF ORDERS SUSTAINING DEMURRERS

Because this appeal arises from the grant of a demurrer, we accept as true all factual allegations expressly pleaded in the complaint and interpret those allegations in the light most favorable to the plaintiff. *See Coutlakis v. CSX Transp., Inc.*, 293 Va. 212, 215, 796 S.E.2d 556, 558 (2017). Two important limitations on this principle, however, deserve emphasis.

First, while we also accept as true unstated inferences to the extent that they are *reasonable*, *see id.*, we give them no weight to the extent that they are *unreasonable*. The difference between the two turns on whether "the inferences are strained, forced, or contrary to reason," *County of Chesterfield v. Windy Hill, Ltd.*, 263 Va. 197, 200, 559 S.E.2d 627, 628 (2002), and thus properly disregarded as "arbitrary inferences," *Stephens v. White*, 2 Va. (2 Wash.) 203, 210-11 (1796) (opinion of Roane, J.).[3]

---

[2] The Partial Final Judgment does not address Dennis Hunley. *See* J.A. at 157-59. We assume that this fact explains why Coward has not appealed the grant of his demurrer.

[3] *See also Farmer's Adm'x v. Chesapeake & Ohio Ry.*, 144 Va. 65, 92, 131 S.E. 334, 342 (1926) ("[I]n drawing inferences favorable to the demurree, the court can draw only such inferences as a jury might have *fairly* drawn from the evidence. The Court is not bound to draw inferences that are strained, forced, or contrary to reason." (emphasis in original)); W. Hamilton Bryson, Bryson on Virginia Civil Procedure § 6.03[5][c], at 6-48 (5th ed. 2017) (noting that a court will not adopt inferences that are "strained, forced, or contrary to reason" (citation omitted)).

Second, we must distinguish allegations of historical fact from conclusions of law. We assume the former to be true *arguendo*, but we assume nothing about the correctness of the latter because "we do not accept the veracity of conclusions of law camouflaged as factual allegations or inferences." *AGCS Marine Ins. v. Arlington Cty.*, 293 Va. 469, 473, 800 S.E.2d 159, 161 (2017). "Instead, we review all conclusions of law de novo." *Id.*

## B. TORTIOUS INTERFERENCE WITH PARENTAL RIGHTS

In *Wyatt*, we found the conceptual origins of civil liability for a "tortious interference with parental rights" in English common law. 283 Va. at 699, 725 S.E.2d at 562.[4] Adapting that common-law tradition to modern times, we adopted the reasoning of the Supreme Court of Appeals of West Virginia in *Kessel v. Leavitt*, 511 S.E.2d 720 (W. Va. 1998), which in turn adopted and applied the Restatement (Second) of Torts § 700 (1977). The facts in *Kessel* involved "egregious conduct that barely fell short of outright kidnaping and abduction." *Wilson v. Bernet*, 625 S.E.2d 706, 714 (W. Va. 2005). We held that *Kessel*'s synthesis of the Restatement's model of liability "provide[d] a particularly helpful model for the elements of the

---

[4] Coward characterizes her claim as a constitutional tort. She states that the circuit court's "subject matter jurisdiction" over her claim rests in part on "the Fifth Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, and corresponding provisions of the Virginia Constitution" and that the right she seeks to vindicate "is a fundamental liberty protected by the United States Constitution and the Virginia Constitution." J.A. at 47-48. She is mistaken. Constitutional torts — whether asserted under 42 U.S.C. § 1983, *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), or the self-executing provisions of the United States and Virginia Constitutions — can only be asserted against state actors. *See, e.g.*, *American Mfrs. Mut. Ins. v. Sullivan*, 526 U.S. 40, 49-50 (1999); *Blum v. Yaretsky*, 457 U.S. 991, 1002-03 (1982); *Bivens*, 403 U.S. at 389; *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615-16 (4th Cir. 2009); *Holly v. Scott*, 434 F.3d 287, 290-94 (4th Cir. 2006). *But see Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968) (holding that an exception to this rule is 42 U.S.C. § 1982, which prohibits discrimination by private individuals pursuant to the 13th Amendment). In this case, Coward does not allege that any of the defendants were state actors. We thus will disregard her multiple allegations that the defendants violated her "constitutional rights," J.A. at 58-64.

tort" and was "consistent with Virginia law." *Wyatt*, 283 Va. at 696, 699, 725 S.E.2d at 560, 562.

We held in *Wyatt* that to state a prima facie case for tortious interference with parental rights, a plaintiff must plead and prove at least four elements:

> (1) the complaining parent has a right to establish or maintain a parental or custodial relationship with his/her minor child; (2) a party outside of the relationship between the complaining parent and his/her child intentionally interfered with the complaining parent's parental or custodial relationship with his/her child by removing or detaining the child from returning to the complaining parent, without that parent's consent, or by otherwise preventing the complaining parent from exercising his/her parental or custodial rights; (3) the outside party's intentional interference caused harm to the complaining parent's parental or custodial relationship with his/her child; and (4) damages resulted from such interference.

*Id.* at 699, 725 S.E.2d at 562 (quoting *Kessel*, 511 S.E.2d at 765-66).

*Kessel* clarified that these elements presuppose not merely *any* interference of *any* kind, but rather, a *tortious* interference as that concept is summarized both in the text of and the comments to the Restatement. *See Kessel*, 511 S.E.2d at 760-66. In this manner, *Kessel* adopted the Restatement's text and comments as important qualifications on the tort. We added that our authority to recognize the tort stems from English common law, "and the Restatement (Second) of Torts § 700 recites the more modern embodiment of the ancient writ." *Wyatt*, 283 Va. at 694-95, 725 S.E.2d at 559-60; *see also Nelson v. Green*, 965 F. Supp. 2d 732, 755 (W.D. Va. 2013) (noting our reliance on the Restatement as the "modern embodiment" of the tort). The Restatement, therefore, authoritatively frames the issue before us.

According to the Restatement, an actor "is subject to liability to the parent" only when the actor interferes with parental rights "*with knowledge* that the parent *does not consent*." Restatement (Second) of Torts § 700 (emphases added). Comment *a* reinforces the essential

8

premise that there can be no tort unless the actor has "knowledge that the parent has not consented" and "knowledge that the child is away from home against the will of the parent." *Id.* cmt. a. Comment *b* again restates the limitation that no tortious interference can exist unless the interferer "know[s] that the child is away from home against the will of the parent." *Id.* cmt. b.

This against-the-will-of-the-parent requirement serves as an overarching limitation on the tort. None of the multitude of cases cited in *Wyatt* and *Kessel* impose liability without an allegation and supporting proof that the defendant intentionally acted against the will of the complaining parent. A pleader can satisfy the against-the-will-of-the-parent requirement by asserting the absence of consent directly (*e.g.*, "The defendants *knew* that I did not consent."), or can acknowledge giving consent but seek to vitiate it by a showing of incapacity,[5] undue influence,[6] or duress[7] (*e.g.*, "I appeared to consent, but the defendants *knew* that I did not consent

---

[5] *See Chesapeake & Ohio Ry. v. Mosby*, 93 Va. 93, 94, 24 S.E. 916, 916 (1896) (observing that "weakness of mind short of insanity; or immaturity of reason in one who has attained full age; or the mere absence of experience or skill upon the subject of the particular contract, affords *per se*, no ground for relief at law or in equity" on grounds of incapacity (quoting 1 Joseph Chitty et al., A Treatise on the Law of Contracts, and upon the Defences to Actions Thereon 186 (11th Am. ed. 1874))).

[6] *See Gelber v. Glock*, 293 Va. 497, 525, 800 S.E.2d 800, 816 (2017) ("To set aside a deed or contract on the basis of undue influence requires a showing that the free agency of the contracting party has been destroyed." (citation omitted)); *Jenkins v. Trice*, 152 Va. 411, 429-30, 147 S.E. 251, 257 (1929) ("Suggestion and advice addressed to the understanding and judgment do not constitute undue influence, nor does solicitations, unless the party be so worn by the importunities that his will gives way. Earnest entreaty, importunity and persuasion may be employed, but if the influence is not irresistible it is not undue, and its existence is immaterial, even though it is yielded to." (citation omitted)); *Core v. Core's Adm'rs*, 139 Va. 1, 14, 124 S.E. 453, 457 (1924) ("The burden of showing undue influence rests upon those who allege it, and it cannot be based upon bare suggestion, innuendo, or suspicion.").

[7] *See Ford v. Engleman*, 118 Va. 89, 96, 86 S.E. 852, 855 (1915) ("Duress being a species of fraud must be clearly proved . . . ."). *See generally* Kent Sinclair, Sinclair on Virginia Remedies § 43-10[E], at 43-62 to -63 (5th ed. 2016) (noting that "duress is not readily accepted as an excuse" (citation omitted)).

9

and that my putative consent was against my will.").[8] But absent a showing of lack of consent of either kind, the acknowledged presence of consent necessarily defeats any claim of tortious interference with parental rights.[9]

### C. THE COMPLAINT'S ALLEGATIONS

In this case, the circuit court denied Hunley's demurrer because the complaint alleges that she "threatened and used deception to convince [Coward] to give up her baby by telling [Coward] she had marijuana in her urine and that [Hunley] would call social services." J.A. at 153. From that allegation, the court drew the further inference that Hunley "intentionally told the lies to [Coward] in order to adopt the baby," and thus, Coward's consent "was obtained by the undue influence of [S]ynthia Hunley's threats." *Id.*[10] With respect to Hunley, the court

---

[8] We use the word "knew" because *Wyatt* recognized only an intentional tort, not a claim of negligence. *See Wyatt*, 283 Va. at 699, 725 S.E.2d at 562; *Kessel*, 511 S.E.2d at 765-66; Restatement (Second) of Torts § 700 & cmts. a-b; *see also* 3 Dan B. Dobbs et al., The Law of Torts § 603, at 453 (2d ed. 2011 & Supp. 2017) ("Where independent duties to the parents or children to avoid negligence do not exist, the plaintiff must prove intentional interference." (citing *Wyatt*, 283 Va. 685, 725 S.E.2d 555)). Virginia does not recognize a tort of negligent interference with parental rights.

[9] *See, e.g.*, *Hinton v. Hinton*, 436 F.2d 211, 212-13 (D.C. Cir. 1970); *M.C. v. Hollis Indep. Sch. Dist. No. 66*, No. CIV-15-343-C, 2017 U.S. Dist. LEXIS 41954, at *17-18 (W.D. Okla. Mar. 23, 2017); *Anonymous v. Anonymous*, 672 So. 2d 787, 789-90 (Ala. 1995); *Surina v. Lucey*, 214 Cal. Rptr. 509, 511-12 (Cal. Ct. App. 1985); *Stone v. Wall*, 734 So. 2d 1038, 1041-42 (Fla.), *acq.* 188 F.3d 1293, 1294 (11th Cir. 1999); *Wolf v. Wolf*, 690 N.W.2d 887, 891-93 (Iowa 2005); *Khalifa v. Shannon*, 945 A.2d 1244, 1253-56 (Md. 2008); *Murphy v. I.S.K. Con. of New England, Inc.*, 571 N.E.2d 340, 351-52 (Mass. 1991); *Kipper v. Vokolek*, 546 S.W.2d 521, 525-27 (Mo. Ct. App. 1977); *Tavlinsky v. Ringling Bros. Circus*, 204 N.W. 388, 389-91 (Neb. 1925); *Bartanus v. Lis*, 480 A.2d 1178, 1181-82 (Pa. Super. Ct. 1984); 67A C.J.S. *Parent and Child* § 343, at 438 (2013); Dobbs et al., *supra* note 8, § 603, at 450 (2d ed. 2011); William L. Prosser & W. Page Keeton, Prosser and Keeton on the Law of Torts § 124, at 925 (Dan B. Dobbs et al. eds., 5th ed. 1984).

[10] The complaint provides factual allegations addressing Hunley's alleged undue influence over Coward before Coward signed the Petition and Agreed Order in two places. Paragraph 40 alleges that "Hunley told [Coward] that because marijuana was found in a urine screen, if she did not agree to an adoptive placement, social services would remove the child and place [the child] in foster care." J.A. at 51. Paragraph 52 alleges that Hunley told Coward "that

10

reasoned that the allegations in the complaint, if believed by a factfinder, vitiated what would otherwise have been early and unqualified consent to surrender physical custody of the child in anticipation of a later adoption proceeding.[11]

The circuit court found that it could not draw the same conclusion regarding the medical defendants or Baker. The complaint does not allege that any of these defendants knew of, much less approved of, Hunley's alleged misrepresentations and threats. Nor does the complaint allege with specificity a civil conspiracy or any other form of knowing complicity with Hunley's alleged misdeeds. If any vitiation inference is to be drawn, it must come from the specific factual allegations against each of these defendants. The circuit court reviewed each of these allegations and concluded that such an inference was not warranted. We agree.

1.

Beginning first with the medical defendants, the complaint alleges that, in the delivery room, Coward "talked about placing the baby up for adoption." *Id.* at 50. In response, Dr.

---

if [Coward] did not call Holston Valley Medical Center, [the child] would be referred to [DSS]. [Hunley] stated to [Coward] that because marijuana was detected in [Coward's] urine, referral to [DSS] would result in [the child] being placed in foster care and [Coward] getting 'in trouble.'" *Id.* at 53. The complaint, however, never expressly alleges that these statements were false. For purposes of our opinion, we assume *arguendo* that a factfinder could reasonably infer that these statements were false.

[11] Coward contends that the circuit court made premature factual findings at the demurrer stage. *See* Appellant's Br. at 9-10 (arguing that the trial court improperly "weighed the evidence"). We disagree. The circuit court recognized that "at the demurrer stage, it is not the function of the trial court to decide the merits of the allegations set forth in a complaint, but only to determine whether the factual allegations pled and the reasonable inferences drawn therefrom are sufficient to state a cause of action." J.A. at 149 (citation omitted). It is true that a few aberrant statements in the court's letter opinion imply a more searching inquiry, *see id.* at 151-53, but we think that those statements should be read through the lens of the proper standard governing demurrers. We decline to "fix upon isolated statements of the trial judge taken out of the full context in which they were made, and use them as a predicate for holding the law has been misapplied." *Yarborough v. Commonwealth*, 217 Va. 971, 978, 234 S.E.2d 286, 291 (1977).

Turano passed along a telephone number for potential adoptive parents. The complaint states that the unnamed hospital employees who carried the message asked Coward to keep the information to herself so that they would not "get in trouble," *id.*, but it makes no allegation that their apprehension somehow influenced, much less coerced, Coward into contacting the prospective adoptive parents. In fact, the complaint states that Coward did just that. She called the phone number and initiated a conversation with Hunley about adopting the child. During a meeting with Hunley and her husband later that day, Coward "verbally agreed to allow the Hunleys to adopt [the child]." *Id.* at 52. No allegations suggest that the medical defendants participated in the meeting or made any representations to Coward.

Dr. Deel, an employee of Wellmont Medical Associates, Inc., directed the child to be transferred to a "neo-natal intensive care unit" at Holston Valley Medical Center. *Id.* at 50. At some point during the day, Coward "asked to see [the child], but was denied the opportunity due to his respiratory distress." *Id.* The complaint further alleges that the child's discharge report "noted that [Coward] had orally consented to place [the child] up for adoption." *Id.* at 51. Conspicuously absent, however, is any allegation that the medical defendants lied about the child's condition and used respiratory distress as a pretext for separating the child from Coward.

We also do not believe that this bold inference can be drawn from the allegation that Hunley worked as a licensed practical nurse for Dr. Deel. As explained earlier, unstated *inferences* from express allegations (particularly those implying egregious wrongful conduct) must be *reasonable* — not immoderately speculative, strained, or contrary to ordinary experience. *See supra* at 6 & note 3. The circuit court correctly did not infer, based solely on the working relationship between Dr. Deel and Hunley, that Dr. Deel participated in a fraudulent conspiracy to send a newborn child to another hospital for unnecessary medical treatment for the

12

sole purpose of coercing a reluctant mother to follow through with her previously announced desire to pursue an adoption plan.[12] If Coward intended to make such an accusation, she should have stated it expressly. She cannot insert this separate charge into the case as a mere inference.

The complaint also states that the day after the child's birth, Coward and the biological father executed an agreement to "assign[] custody of [the child] to the Hunleys 'pending finalization of documents with lawyer.'" J.A. at 52 (citation omitted). The complaint does not allege that Coward was coerced into signing the agreement, that anyone misled her about its meaning, or that she was mentally incapacitated. The complaint alludes to the fact that, while in the hospital and upon her discharge, she received various prescription medications including Percocet for pain relief. But here again, the complaint does not allege that these medications incapacitated her from pursuing her adoption plan, that her verbal and written agreements were invalid because she was under the influence of medication, or that the hospital defendants took advantage of her medicated state to separate her from her child.

In short, the circuit court correctly held that the complaint fails to state a claim that the medical defendants *tortiously* interfered with Coward's parental rights. None of the factual allegations in the complaint state with any specificity that the medical defendants participated in a conspiracy or concert of action with Hunley. No allegations suggest that they knew of Hunley's alleged coercion or misrepresentations, or worse, that they transferred the newborn

---

[12] Coward also alleges that the "transport team noted no signs of distress in [the child]." J.A. at 51. If her point is that the team did not see any signs of distress because there were none, there could be a host of perfectly reasonable explanations: Dr. Deel may have observed signs of distress that would not be noticeable to a less-trained transport team; the signs of distress could have been detectable only by medical tests or observable only by medical equipment and not the naked eye; or the signs of distress could have been episodic, outwardly observable only in cycles or at indeterminate moments in time. What would not be a reasonable inference from the non-observations of the transport team is that Dr. Deel simply invented respiratory distress as part of a fraudulent conspiracy to help one of his employees adopt a newborn child.

child for emergency care at another hospital not because of the child's medical needs but because of a conspiracy to separate Coward from her son. Coward's brief on appeal, moreover, makes no mention at all of any conspiracy or concert-of-action liability. Nor does she contend that the circuit court erred in not accepting her conclusory allegations as sufficient to plead conspiracy or concert of action.

The complaint expressly alleges that Coward initiated the adoption plan, contacted the prospective adoptive parents, verbally agreed to proceed with an adoption, and executed a written agreement authorizing the Hunleys to have sole physical custody of the child. No allegation in the complaint, express or implied, claims that the medical defendants interfered with Coward's parental rights "*with knowledge* that [Coward] [*did*] *not consent*," Restatement (Second) of Torts § 700 (emphases added); *see also id.* cmt. a, or that any of them "[knew] that the child [was] away from home against the will of [Coward]," *id.* cmts. a-b.

2.

We reach the same conclusion with respect to Baker. No facts alleged in the complaint suggest that Baker employed any coercive conduct or made any misrepresentations. The only factual allegations against Baker are that she prepared the Petition and Agreed Order, presented them to Coward and the biological father, and commented "that they were 'doing a good thing'" because "the Hunleys were 'good people' and would give [the child] a 'good and happy life.'" J.A. at 54. Coward does not allege that she voiced any objection to signing the Petition and Agreed Order or, for that matter, that she was reluctant to do so. As was true for the medical defendants, no allegation claims that Baker interfered with Coward's parental rights "*with knowledge* that [Coward] [*did*] *not consent*," Restatement (Second) of Torts § 700 (emphases

14

added); *see also id.* cmt. a, or that she "[knew] that the child [was] away from home against the will of [Coward]," *id.* cmts. a-b.

Coward alleges that Baker did not comply with various procedural statutes and rules in submitting the Petition and Agreed Order to the JDR court.[13] Coward's brief on appeal, however, does not even mention these statutes and rules, offers no case law interpreting them, and presents no legal authority demonstrating how any of them, if violated, create a private cause of action under *Wyatt*. Coward's brief also does not discuss or respond to the circuit court's holding on this issue:

> Even if this Court found that all the statutes provided by Plaintiff are applicable and actionable, and if this Court found that Sue Baker intentionally violated the statutes in order to speed up the adoption process, those findings would not negate Plaintiff's express consent to the agreed order, giving the Hunleys full physical custody.

J.A. at 152.

As we have often said, "Lack of an adequate argument on brief in support of an assignment of error constitutes a waiver of that issue." *Andrews v. Commonwealth*, 280 Va. 231, 252, 699 S.E.2d 237, 249 (2010) (applying predecessors to Rules 5:17(c)(6) and 5:27(d)), *cert. denied*, 564 U.S. 1008 (2010).[14] Our colleagues on the Court of Appeals have expressed the point quite well:

> "At the risk of stating the obvious, the Rules of the Supreme Court are rules and not suggestions; we expect litigants before this Court

---

[13] The complaint identifies the following statutes and Rule that Baker allegedly violated: Code §§ 8.01-271.1, 16.1-241, 16.1-262, 16.1-277.02, 63.2-1232, 63.2-1233, and Rule 1:4(c). *See* J.A. at 55-56, 60-64. We question Coward's interpretation of many of these provisions but offer no opinion on them.

[14] *See also Palmer v. Atlantic Coast Pipeline, LLC*, 293 Va. 573, 580, 801 S.E.2d 414, 417-18 (2017); *John Crane, Inc. v. Hardick*, 283 Va. 358, 376, 722 S.E.2d 610, 620, *modified in part on other grounds*, 284 Va. 329, 732 S.E.2d 1 (2012); *Howard v. Commonwealth*, 281 Va. 455, 461, 706 S.E.2d 885, 888 (2011).

15

to abide by them." If [appellant] believed that the trial court erred, Rule 5A:20(e) required [her] "to present that error to us with legal authority to support [appellant's] contention." Simply put, "it is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." [Appellant's] failure to provide legal argument and authority as required by Rule 5A:20(e) leaves us without a legal prism through which to view [her] alleged error and, therefore, is significant; accordingly, we deem [her undeveloped argument] waived.

*Bartley v. Commonwealth*, 67 Va. App. 740, 746, 800 S.E.2d 199, 202 (2017) (alteration and citations omitted) (applying Rule 5A:20(e), which is textually similar to Rule 5:27(d)); *see also Fadness v. Fadness*, 52 Va. App. 833, 849-51, 667 S.E.2d 857, 865-66 (2008). We thus decline to address Coward's argument regarding these procedural requirements.

III.

In sum, the complaint does not allege facts sufficient to state a claim for tortious interference with parental rights against the medical defendants or Baker. We thus affirm the circuit court's Partial Final Judgment granting their demurrers.[15]

*Affirmed.*

---

[15] We offer no opinion on the circuit court's denial of Hunley's demurrer or its grant of Dennis Hunley's demurrer.

16