# COURT OF APPEALS OF VIRGINIA

---

**Record No. 0383-25-2**

---

PATRICK CLANCY

v.

MATTHEW PEARMAN, ET AL.

---

Present: Chief Judge Decker, Judges Malveaux and Duffan
Argued at Richmond, Virginia

Opinion Issued April 21, 2026[*]

---

**FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY**
Cheryl V. Higgins, Judge

J. Lloyd Snook, III (Snook & Haughey, P.C., on briefs), for appellant.

Melissa Y. York (Jennifer D. Royer; Royer Law Firm, P.C., on brief), for appellees.

---

**MEMORANDUM OPINION BY**
**CHIEF JUDGE MARLA GRAFF DECKER**

Patrick Clancy alleges that during a high-school soccer conditioning session, he sustained an exertional heat injury due to the gross negligence of School Athletic Director Matthew Pearman and Coach Stuart Pierson. Clancy appeals the trial court's grant of summary judgment against him based on rulings that he assumed the risk of injury and was contributorily negligent as a matter of law. Clancy also claims that the trial court erred by ruling that testimony from his expert witness is inadmissible on the ground that the witness is not a medical doctor. We hold the trial court erred by granting summary judgment because the record does not establish that no material facts remain in dispute. But we conclude that it did not err by ruling that the challenged

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

expert testimony is inadmissible. As a result, we affirm in part, reverse in part, and remand for further proceedings.

BACKGROUND[1]

On the morning of July 21, 2017, Clancy attended an off-season conditioning session for the boys soccer team at Monticello High School (MHS) in Albemarle County. He was sixteen years old, and he played for the team during the prior season.

The day before the session, the National Weather Service announced a heat advisory for Albemarle County. The advisory was scheduled to take effect at 10:00 a.m. on the day of the session. The session began at 8:00 a.m. and ended around 10:00 a.m.

That morning, before the session began, Matthew Pearman, the school's athletic director, checked the heat index calculator of the Oregon School Activities Association (OSAA) and determined that conditions were safe enough to allow the session to take place. Stuart Pierson, the team's head coach, conducted and supervised the session, which, like all of the team's conditioning sessions, was characterized as "optional." Pierson was licensed by the United States Soccer Federation. Both men were employed by Albemarle County Public Schools (ACPS).

Although Pierson provided the players with breaks, he did not provide water, and the field had no shade in which the players could rest. Despite drinking sixty-four ounces of water during the conditioning session, Clancy became "seriously ill" before it ended. He stopped sweating, developed a bad headache, felt nauseous, and had difficulty walking and thinking. Pierson did not notice that Clancy had stopped perspiring and was feeling sick. He did notice, however, that Clancy was out of water at the end of the session and "ridiculed" him in front of the team. Clancy

---

[1] On review, the appellate court states the facts, and all reasonable inferences flowing from those facts, in the light most favorable to Clancy as the non-moving party on the motion for summary judgment. *See Thurmond v. Prince William Pro. Baseball Club*, 265 Va. 59, 61 (2003). The facts are derived from the pleadings, as supplemented or altered by any relevant admissions and pretrial orders. *See* Rule 3:20.

mentioned a sunburn to Pierson, who responded with "attitude." Clancy did not tell Pierson that he had become sick and needed assistance. Instead, he followed Pierson's instructions to the team to pick up equipment on the field. That chore kept them there "well after" the heat advisory began at 10 a.m. Although "nothing" "physically" "prevented [Clancy] from requesting to sit out a few minutes" during the session, Clancy believed that Pierson "ma[de] . . . clear that [he] was being judged" for expressing concerns about continuing to participate that day.

When Clancy's brother drove him home, he had a severe headache and nausea. He could not walk or talk, he was still not perspiring, and his fingers and toes began to turn blue. His mother put him in a cold shower, where he collapsed and vomited. She then submerged him in a cold bath to reduce his body temperature more rapidly. He continued to vomit and gasp for air, and the blue discoloration worsened, so his family drove him to the hospital.

The emergency room physician diagnosed Clancy with heat exhaustion. He was treated with IV fluids. According to emergency room records, while Clancy reported he took a cold shower, apparently neither he nor his mother mentioned that he had taken a cooling bath, his appendages had turned blue, he had collapsed and been unable to walk or talk, or he had stopped sweating. The notes also stated that he did not report vomiting before he arrived at the hospital and in fact reported that he had not vomited. No one in the emergency room diagnosed Clancy with heat stroke. Clancy left the hospital that afternoon with a note stating that he was cleared to return to sports "after [the next day] as weather temperatures allow[ed]." Later, however, he was diagnosed with "exertional heat stroke, the most severe form of exertional heat illness." He suffered significant permanent health consequences as a result.

Clancy sued, alleging that Pearman and Pierson were liable for gross negligence.[2]  His

pleaded facts encompassed his history with the team, his own actions on the day of his exertional

heat injury, field conditions during the session, and Pearman and Pierson's responsibilities and duty

of care.

The July 21 session was the fourth summer conditioning session of the MHS boys soccer

team that Clancy attended that year.  He missed at least one session for a family vacation and had

not attended any sessions in a week, which Pierson either knew or should have known.  Although

the sessions were optional, Clancy believed that failing to attend meant he "would be less likely to

play" during the regular season.

Clancy knew a heat advisory was in effect the day before the session, and he spent that day

"engaged in indoor activities" at home.  Clancy and his mother thought that Pearman and Pierson

would cancel the July 21 session or move it indoors if the heat was excessive, which had happened

on prior occasions.  Clancy drank sixty ounces of water before the session, and he took two

additional liters with him as all the players were instructed to do.

ACPS coaches were required to comply with the Virginia High School League (VHSL) heat

guidelines.  According to guidance provided to all ACPS coaches, ten to fourteen days are needed

"to acclimate to hot weather conditions," and "[a]thletes who have not become acclimatized . . . will

be less tolerant of extreme heat[] and at greater risk of exertional heat illness."

The OSAA heat index calculator was referenced in the VHSL heat guidelines as a resource

for determining the safety of outdoor sessions when heat and humidity might be an issue.  The

---

[2] Clancy's mother originally sued on his behalf.  When he turned eighteen, the court granted his motion to file an amended complaint naming himself as the plaintiff.  Also, the original complaint alleged both ordinary and gross negligence.  Pearman and Pierson filed demurrers, asserting that the allegations were insufficient as a matter of law because they did not owe Clancy a duty of care.  The court sustained the demurrers as to the ordinary-negligence count and dismissed it with prejudice but denied it as to the gross-negligence count and granted leave to amend.  Clancy amended his complaint, refining his allegations of gross negligence.

VHSL heat guidelines, however, "strongly encourage[d]" using the wet bulb globe temperature (WBGT) method for accurately assessing outdoor conditions in such circumstances. The WBGT method "t[ook] into account ambient air temperature, relative humidity, and radiant heating from the sun." A WBGT thermometer was available on-site, but neither Pearman nor Pierson used it that morning.

The conditioning session was held on the school's artificial-turf athletic field, on which "the air temperature . . . c[ould] be substantially higher than on a grass field"—thirty-five to sixty degrees higher. The field was in full sun with "little wind" at that time. As alleged in Clancy's complaint, when the session began, "the estimated [WBGT] . . . was about 84 degrees" Fahrenheit with 70% humidity. By the end, it was about 90 degrees with 57% humidity. Those levels were "right at the borderline between 'Moderate Risk for Heat Related Illness' and 'High Risk,'" at which additional rests and exertion limits were recommended. No athletic trainer was present despite a provision in the ACPS Athletics Heat Management Plan requiring a trainer at "every school-sponsored practice or game."

Clancy's complaint alleged that Pearman and Pierson violated the standard of care by, among other things, conducting the conditioning session outdoors in excessive heat, not having an athletic trainer present, being insufficiently attentive to the well-being of the players, having no shade available for the participants or their water, not providing adequate cold water, and not using a WGBT to accurately gauge the outdoor temperature on the artificial-turf field. Clancy asserted that Pearman and Pierson's conduct violated the VHSL guidelines, which they were obligated to follow under ACPS rules.

Pearman and Pierson demurred to the claim of gross negligence, arguing that they did not owe a legal duty to Clancy. The court overruled the demurrers.

Before trial, Pearman and Pierson filed a motion *in limine* to limit the testimony of Douglas Casa, one of Clancy's expert witnesses. They argued that Casa, who had a Ph.D. in exercise physiology, could not testify about Clancy's diagnosis and treatment or provide any other medical opinion because he was not a medical doctor. The trial court granted the motion to exclude Casa's testimony about Clancy's "etiology, diagnosis, prognosis, treatment, treatment plan, and disability" on the ground that he was "not a medical doctor" and his testimony "d[id] not fit into any Virginia statutory exception to the proscriptions on medical testimony."[3]

After Clancy responded to the defense's requests for admission, Pearman and Pierson made a motion for summary judgment, arguing that Clancy's claim was barred by both his assumption of the risk of heat-related illness and his contributory negligence. They asserted that Clancy voluntarily participated in the conditioning session knowing that it was hot outside and that a heat advisory had been in effect the day before and would be in effect again after the morning's activity. They noted that Clancy did not take a break or alert anyone when he started feeling ill, despite seeing another player take a break without immediate repercussions. Clancy countered that he did not assume the risk that Pearman and Pierson would neglect to take proper precautions to prevent the players from suffering heat-related illness and that he also was not contributorily negligent by failing to recognize his symptoms of exertional heat illness.

The trial court granted the motion for summary judgment, based on both assumption of the risk and contributory negligence. After acknowledging "a certain amount of pressure on kids [who] want to be on high school teams . . . to put forth effort even when . . . not feeling their best," the court noted that "at some point" student athletes "have to say, I am not feeling well, I'm feeling sick." It found that Clancy "was aware of the risk of" exertional heat illness from "practicing

---

[3] The court denied the motion to exclude Casa's testimony regarding the applicable standard of care but noted that the motion could be "renew[ed] . . . at trial as appropriate."

[outside during] a heat advisory" and "exposed himself to that risk."  As to Pearman and Pierson's claim that Clancy was contributorily negligent, the court held that he "contributed to his own injuries by not . . . protect[ing] himself."

ANALYSIS

I.  Summary Judgment

Clancy challenges the trial court's ruling granting the defendants' motion for summary judgment.  In ruling on a motion for summary judgment, the trial court considers the facts pleaded, as well as any relevant admissions and court orders.  *See* Rule 3:20; *Llewellyn v. Fechtel*, 83 Va. App. 364, 376 (2025) (recognizing that discovery depositions and interrogatory answers may be used but generally are not binding).  It is axiomatic that "[s]ummary judgment is a drastic remedy, available only when there are no material facts genuinely in dispute."  *Llewellyn*, 83 Va. App. at 375 (quoting *Fultz v. Delhaize Am., Inc.*, 278 Va. 84, 88 (2009)); *see Brown v. Sparks*, 262 Va. 567, 571 (2001).  "[I]n an appeal of a decision awarding summary judgment, the trial court's determination that no genuinely disputed material facts exist[, as well as] its application of law to the facts[,] present issues of law subject to de novo review."  *Shifflett v. Latitude Props., Inc.*, 294 Va. 476, 480 (2017) (quoting *Mount Aldie, LLC v. Land Tr. of Va., Inc.*, 293 Va. 190, 196-97 (2017)).  And the appellate court "review[s] the record [under] the same standard a[s the] trial court . . . , accepting as true [the facts and] those inferences from the facts that are most favorable to the nonmoving party, unless the inferences are forced, strained, or contrary to reason."  *Stahl v. Stitt*, 301 Va. 1, 8 (2022) (quoting *Fultz*, 278 Va. at 88).

Clancy argues that the trial court erred by granting the defendants' motion for summary judgment on assumption-of-the-risk and contributory-negligence grounds, both of which are affirmative defenses.  *See Colas v. Tyree*, 302 Va. 17, 27 (2023) (recognizing these affirmative defenses).  Either defense, if proved, bars the plaintiff's recovery for ordinary or gross negligence.

- 7 -

*See Thurmond v. Prince William Pro. Baseball Club*, 265 Va. 59, 64 (2003) (assumption of the risk); *Thomas v. Snow*, 162 Va. 654, 660-61 (1934) (contributory negligence), *cited with approval in Griffin v. Shively*, 227 Va. 317, 322 (1984). We address these defenses in turn, in the context of this case, "mindful not to invade the province of the fact finder, whose role it is to resolve 'any inconsistencies and discrepancies'" in the evidence in a trial on the merits. *Llewellyn*, 83 Va. App. at 375 (quoting *W. Refin. Yorktown v. County of York*, 292 Va. 804, 826 (2016)).

"[W]hen a motion for summary judgment asserts an affirmative defense . . . , the burden of proof . . . rests solely on the civil defendant." *AlBritton v. Commonwealth*, 299 Va. 392, 404 (2021). To meet this burden, the defendant "must demonstrate that no reasonable factfinder governed by the applicable legal standard could *reject* the asserted defense on the merits." *Id.* In other words, "[a trial] court can enter summary judgment in the defendant's favor on [an affirmative defense] 'only when reasonable minds could not differ'" in concluding that the defense applies to bar the plaintiff's recovery. *See id.* (quoting *Jenkins v. Pyles*, 269 Va. 383, 389 (2005)).

It is in the context of these legal parameters that this Court reviews each challenge.

### A. Assumption of the Risk

"The doctrine of assumption of risk rests on two premises: (1) that the nature and extent of the risk are fully appreciated; and (2) that [risk] is voluntarily incurred." *Davis v. Sykes*, 202 Va. 952, 954 (1961). Virginia applies a subjective standard when evaluating a claim of assumption of the risk, assessing "whether a particular plaintiff fully understood the nature and extent of a known danger and voluntarily exposed [him]self to that danger." *Thurmond*, 265 Va. at 64. Significantly, whether a person assumed the risk of injury from a known danger is a question for the jury "unless reasonable minds could not differ on the issue." *Id.*

The trial court ruled that Clancy assumed the risk of heat-related injury by voluntarily participating in the conditioning session when he knew a heat advisory was or was about to be in

effect. Clancy counters that the trial court did not adequately consider Pearman and Pierson's alleged violation of the standard of care. He argues that "the risk that [he] would have had to . . . assume[] was not merely the risk associated with playing soccer in the heat, but specifically the risk that Coach Pierson would . . . violat[e] the standard of care." He contends that Pierson did so in several ways. First, Pierson "fail[ed] . . . to accurately measure the temperature" on the athletic field (which he states should have been done with an available WBGT thermometer). Second, according to Clancy, Pierson did not provide cool water or shade and failed to monitor the players for "the risk of exertional heat injury." Clancy explains that although he was aware of "some risk of an exertional heat injury" that day, he was "not aware" that the coach would not follow the standard of care "that would keep him safe from exertional heat injury." Pearman and Pierson argue that their claimed negligence would nevertheless have been apparent to Clancy once he arrived at the athletic field and he thereby assumed the risk of participating in their negligently operated conditioning session.

We hold that the record supports Clancy's objection to the grant of summary judgment. The assumption-of-the-risk defense does not apply where the defendants' negligence creates risks that the plaintiff is not aware of and that are beyond the risks ordinarily expected from participating in the activity. *See Thurmond*, 265 Va. at 66-67; *see also Artrip v. E.E. Berry Equip. Co.*, 240 Va. 354, 358-59 (1990) (noting that the defense also does not apply to risks that are involuntary, leaving the plaintiff with no viable alternative course of action). The trial court's ruling does not address Clancy's central claim that Pearman and Pierson's alleged gross negligence exacerbated the risk of heat-related illness beyond that inherent in participating in an outdoor soccer conditioning session during a heat wave.

Issues of material fact therefore remain regarding whether Pearman and Pierson were grossly negligent in conducting the conditioning session that morning and whether Clancy was

aware that they would conduct the session in the manner in which they did. For example, Clancy states that they did not provide the players with cold water during the session and that no shade was available in which they could rest or keep their own water cool. Pearman and Pierson, however, represent that the players had access to a nearby concessions building, ice machines, water fountains, and air-conditioning. Clancy argues that Pearman and Pierson violated the VHSL guidelines, including by failing to utilize an available WBGT thermometer to assess the temperature risk, but Pearman and Pierson claim that their conduct fell "well within" the guidelines. In fact, the parties do not even agree whether the VHSL guidelines provide the relevant standard of care for evaluating Pearman and Pierson's conduct, and Clancy represents that one of his designated expert witnesses would testify at a trial to a different standard of care.

Further illustrating the facts in dispute, Pearman and Pierson maintain that the conditioning session was completely voluntary, Clancy knew the temperature would be extremely hot, and he could have taken a break. Clancy responds that he felt pressure to attend the session, fearing he "would be less likely to play" during the regular season and would be judged by Pierson if he asked to take a break or decided to leave. Clancy also states that he was deterred from "request[ing] to sit out a few minutes" during the session specifically because of Pierson's "attitude" when Clancy mentioned sunburn during the activity. It is unclear on the existing record how much pressure the players faced to attend and fully participate in the conditioning session despite the morning's extreme heat.

Based on the record here, disputed questions of fact remained for a jury to decide to determine whether the conduct of Pearman and Pierson created risks that Clancy did not know about or could not fully appreciate. Reasonable minds could disagree about whether Clancy assumed the risk of heat-related illness by participating in the allegedly voluntary conditioning

session under the supervision of Pearman and Pierson. Consequently, the trial court erred by relying on this ground as a basis for granting the extreme remedy of summary judgment.

### B. Contributory Negligence

Contributory negligence "must be proved according to an objective standard [of] whether the plaintiff failed to act as a reasonable person would have acted for his own safety under the circumstances." *Jenkins*, 269 Va. at 388. "[W]hether a plaintiff is guilty of contributory negligence is ordinarily a question of fact . . . ." *Rascher v. Friend*, 279 Va. 370, 375 (2010) (quoting *Jenkins*, 269 Va. at 389).

The trial court ruled that Clancy "contributed to his own injuries by not taking the necessary actions to protect himself." The court based this ruling on the fact that Clancy did not alert anyone that he was feeling unwell. It reasoned that "at some point" student athletes "have to say, I am not feeling well, I'm feeling sick." Clancy contends that the evidence did not prove he was contributorily negligent as a matter of law and, further, that the trial court's finding of contributory negligence "[wa]s really an argument for reduction of damages." He asserts that material facts remain in dispute and should be decided by a jury.

Clancy was sixteen years old when he participated in the summer conditioning session. Minors age fourteen and older are presumed capable of understanding and avoiding danger absent proof of an inability to do so. *Grant v. Mays*, 204 Va. 41, 44 (1963). Even so, the conduct of minors over fourteen is not measured by adult standards but, instead, by the "degree of care [that] children of the same age, experience, discretion[,] and knowledge would exercise under the same or similar circumstances." *Id.* at 45. As a result, Clancy's conduct must be evaluated as the conduct of a sixteen-year-old athlete in his position would be.

Clancy drank sixty ounces of water before the conditioning session, and he took two more liters of water with him, which he drank during the session to stay hydrated. Clancy and his

- 11 -

mother—who, like Pierson, was an athletic coach in the school system—expected that the activity would be moved indoors if Pearman and Pierson determined that the outside temperature was too high.[4] They believed that the defendants were adequately trained to recognize when excessive heat would pose a danger to the participants' safety and would cancel the conditioning session or make alternative arrangements to ensure that safety. Again, Clancy stated that he felt he would have fewer opportunities to play during the season if he did not attend the conditioning session and would be judged negatively if he asked to take a break. Pearman and Pierson, on the other hand, asserted that Clancy saw another player at the session take a break and that Clancy was aware the other player did not face any repercussions. Clancy, however, indicated that he "d[id]n't know the circumstances" surrounding that player's "removing himself from play." As such, that fact does not compel an inference as a matter of law that the other player's circumstances were sufficiently analogous to Clancy's to be of significance.

Further, Clancy suggests that "confusion" and "irrational . . . behavior" are "among [the] symptoms" of exertional heat injury. He argues that this provides yet another reason that "assess[ing] his behavior to decide whether he was acting 'reasonably'" or in a contributorily negligent fashion "should [have] be[en] left to [a] jury." Pearman and Pierson argue that nothing in the record indicates "Clancy was experiencing confusion or irrational . . . behavior . . . during the conditioning session as no such symptoms were pled or established in discovery." To the contrary, Clancy specifically pleaded that he "became seriously ill" *during* the session and had "difficulty . . . even thinking" "*[b]y* the end of [it]." (Emphasis added). This allegation supports an inference that he did, in fact, experience confusion during the session. And his interrogatory

---

[4] Pearman and Pierson correctly note that Clancy's mother, as a coach, had received training similar to Pierson's for "prevent[ing] and treat[ing] heat-related illness." The record, however, contains only limited information about how much of this knowledge Clancy's mother shared with him, leaving an issue of fact for the jury.

answers notified Pearman and Pierson that one of his expert witnesses, John Jardine, an emergency room physician, would testify that confusion and disorientation are symptoms of exertional heat stroke.

In light of these circumstances, objectively reasonable minds could disagree about whether sixteen-year-old Clancy was negligent in not removing himself from play after he began to feel ill.

Additionally, the trial court's ruling may implicate not whether Clancy was contributorily negligent but, instead, whether he failed to mitigate damages because Pearman and Pierson's tortious conduct alone—holding a conditioning session "without proper safety measures in place"—caused his injury. This Court recently noted the difference between the theories of a plaintiff's contributory negligence and his duty to mitigate damages. *See Rodrigue v. Butts-Franklin*, 79 Va. App. 645, 655-56 (2024). "If the plaintiff's injury occurs because [he] failed to exercise reasonable care *contemporaneously* or *concurrently* with the negligent act of the defendant, [that failure] constitutes contributory negligence that bars [his] recovery." *Id.* at 655. A "plaintiff's duty to mitigate damages," by contrast, "arises . . . *after* [a] defendant's tortious conduct." *Id.* (quoting Kent Sinclair, *Sinclair on Remedies* § 3-6[A], at 3-62 (5th ed. 2016) (emphasis added)). And unlike contributory negligence, a failure to mitigate "does not necessarily bar all recovery." *Monahan v. Obici Med. Mgmt. Servs.*, 271 Va. 621, 633 (2006).

In light of this rationale, we conclude that a jury could find that the issue of whether Clancy acted reasonably once he started to feel unwell was one of failure to mitigate damages rather than contributory negligence. If the jury were to find that Pearman and Pierson were grossly negligent for holding the session outside in the heat and that Clancy was *not* at fault for deciding to attend the conditioning session in the first place but *was* at fault for not resting when he began to feel ill, the jury might properly conclude, at most, that Clancy failed to mitigate his damages.

Whether Clancy was contributorily negligent or failed to mitigate his damages involves factual determinations that the parties dispute and, accordingly, should be resolved by a jury at trial. *See Llewellyn*, 83 Va. App. at 375 ("'[I]f the evidence is conflicting on a material point or if reasonable persons may draw different conclusions from the evidence,' summary judgment should not be granted." (quoting *Fultz*, 278 Va. at 88)).

Accordingly, we hold that the trial court erred by granting summary judgment in favor of Pearman and Pierson on the ground that Clancy assumed the risk of exertional heat injury or was contributorily negligent in sustaining that injury.

## II. Exclusion of Dr. Casa's Testimony

Clancy challenges the trial court's ruling excluding a portion of Dr. Casa's proffered testimony on the ground that Casa is not a medical doctor. He suggests that Casa, an athletic trainer, was qualified to testify about "the prevention, recognition, evaluation, and treatment of heat-related injuries" caused by a soccer conditioning session.

As a preliminary matter, the defendants argue that Clancy waived this assignment of error under Rule 5A:18 by failing to note his objection to the trial court's order limiting Dr. Casa's testimony. Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." But as clarified by the related statute, "it shall be sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objections to the action of the court and his grounds therefor." Code § 8.01-384(A).

Here, Clancy filed a written response to Pearman and Pierson's motion *in limine*, in which he asserted that Dr. Casa should be permitted to testify as an expert witness about Clancy's injury. The parties also presented their arguments to the court at a hearing. So Clancy was not required to

object again when the court ruled in Pearman and Pierson's favor. *See id.* We therefore address the trial court's exclusion of Dr. Casa's expert testimony on the merits.[5]

The decision whether to admit or exclude expert testimony is one left to the sound discretion of the trial court, and this Court will reverse only upon a showing that the court abused its exercise of that discretion. *Graydon Manor, LLC v. Bd. of Supervisors*, 79 Va. App. 156, 168 (2023). The "bell-shaped curve of reasonability governing . . . appellate review" under an abuse-of-discretion standard "rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Qiu v. Huang*, 77 Va. App. 304, 328 (2023) (alteration in original) (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)). In this context, "we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action." *Harris v. Joplin*, 304 Va. 338, 347 (2025) (quoting *Carter v. Commonwealth*, 293 Va. 537, 543 (2017)). "The abuse-of-discretion standard [also] includes review to determine that the discretion was not guided by erroneous legal conclusions." *Carter*, 293 Va. at 543-44 (alteration in original) (quoting *Porter v. Commonwealth*, 276 Va. 203, 260 (2008)). "[A trial] court by definition abuses its discretion when it makes an error of law." *Porter*, 276 Va. at 260 (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)).

It is settled law in Virginia "that only a medical doctor [is qualified to] testify as to the causation of a human physical injury." *Fitzgerald v. Commonwealth*, 273 Va. 596, 602 (2007); *see*

---

[5] Pearman and Pierson also suggest that Clancy failed to cite the proper pages in the record showing his preservation of the issue. Under Rule 5A:20(c)(3), a "deficiency in the reference to the page(s) of the record . . . where the alleged error has been preserved" below can be the subject of "a rule to show cause . . . pursuant to Rule 5A:1A." The rules do not provide a mandatory procedural bar for such a deficiency. *See* Rule 5A:1A(a) (permitting discretionary dismissal for non-compliance). The Court is authorized to dismiss for noncompliance that is "significant." *See Coward v. Wellmont Health Sys.*, 295 Va. 351, 367 (2018) (quoting *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017)). But here, the relevant trial court order is almost immediately preceded in the record by Clancy's forty-five page request to the trial court to "overrule" the motion *in limine*. So we decline on the specific facts of the case to hold that Clancy's failure to cite this filing was significant.

*Conley v. Commonwealth*, 273 Va. 554, 561 (2007); *Combs v. Norfolk & W. Ry.*, 256 Va. 490, 496-97 (1998). Casa is a licensed athletic trainer and a professor of kinesiology at the University of Connecticut. It is undisputed that his status as a doctor derives from his Ph.D. in exercise physiology, not from a degree in medicine.

Having a Ph.D. in a potentially relevant field of study does not render one qualified to give a medical diagnosis and opinion about causation, and Clancy does not argue otherwise. *See generally Norfolk & W. Ry. v. Keeling*, 265 Va. 228, 234-35 (2003) (upholding the exclusion of testimony from a witness with a Ph.D. in biomechanical engineering); *John v. Wong Shik Im*, 263 Va. 315, 318, 321 (2002) (upholding the exclusion of testimony from a licensed psychologist with a Ph.D. in that field). It is undisputed that Dr. Casa is not a medical doctor, so we examine Clancy's argument that Casa's status as an athletic trainer qualifies him to provide an expert opinion on "matters that make up [his] field of expertise as set out in the statutes."

In *Hollingsworth v. Norfolk Southern Railway*, 279 Va. 360, 367-68 (2010), the Supreme Court held that podiatrists were not qualified to testify as to the cause of the plaintiff's injuries because, although the relevant statute allowed podiatrists to *treat* a physical injury to the foot or ankle, it did not allow them to *diagnose* such injuries. The Court focused heavily on the differences in the statutory definitions of the "practice of medicine" and the "practice of podiatry." *Id.* at 366. Crucial to the Court's determination was that the "[p]ractice of medicine" definition includes the term "diagnosis" but the definition of the "[p]ractice of podiatry" does not. *Id.* (alterations in original) (quoting Code § 54.1-2900).

The statute in this case contains a similarly limited definition of the "[p]ractice of athletic training." Code § 54.1-2900. Athletic trainers are qualified in "the prevention, recognition, evaluation, and treatment of injuries or conditions related to athletic or recreational activity that requires physical skill and utilizes strength, power, endurance, speed, flexibility, range of motion[,]

or agility . . . immediately upon the onset of such injury or condition." *Id.* Athletic trainers may provide "subsequent treatment and rehabilitation of such injuries or conditions . . . under the direction of the patient's physician[,] . . . any doctor of medicine," or another listed specialist. *Id.*

When analyzing a statute, the appellate court "must presume that the General Assembly chose, with care, the words that appear in the statute[] and must apply the statute in a manner faithful to that choice." *Boyd v. Weisberg*, 75 Va. App. 725, 740 (2022) (quoting *Jones v. Commonwealth*, 296 Va. 412, 415 (2018)). Consequently, "[we] apply the plain meaning . . . unless the terms are ambiguous or applying the plain language would lead to an absurd result." *City of Virginia Beach v. Va. Marine Res. Comm'n*, 70 Va. App. 68, 74 (2019) (second alteration in original) (quoting *Miller & Rhoads Bldg., LLC v. City of Richmond*, 292 Va. 537, 541 (2016)). Viewed in light of these principles, the definition of "athletic training" in Code § 54.1-2900 supports the trial court's ruling excluding Dr. Casa's testimony about the diagnosis, treatment, or other matters of medical opinion concerning Clancy's condition for three reasons.

First, like in *Hollingsworth*, 279 Va. at 366-67, the applicable statute does not include any form of the word "diagnose" in its description of what "[p]ractic[ing] . . . athletic training" qualifies a practitioner to do. *See* Code § 54.1-2900. *Contrast Hollingsworth*, 279 Va. at 366-67 (holding Virginia's applicable statute permits podiatrists to treat foot and ankle issues but not diagnose them), *with Conley*, 273 Va. at 561-62 (upholding the admission of testimony that the victim had PTSD because a statute specifically authorized licensed clinical social workers to "provide . . . *diagnostic* . . . and treatment services*" regarding such mental disorders (quoting Code § 54.1-3700)).

Second, the statutory limitation in Code § 54.1-2900 provides that athletic trainers are qualified to prevent athletic injuries as well as to recognize, evaluate, and treat them "*immediately [after] the[ir] onset*." Code § 54.1-2900 (emphasis added). Based on this language, the court did not err by concluding that Dr. Casa did not qualify as an expert witness on these topics because he

- 17 -

did not examine Clancy immediately after the onset of the alleged injury. The statutory limitation that athletic trainers may treat and rehabilitate patients "subsequent[ly]" only "under the direction" of a medical doctor or other specifically listed practitioner reinforces this conclusion. *See id.*

Third, no specific statutory exception allows an athletic trainer to testify as an expert witness on these topics. Code § 8.01-401.2 allows only chiropractic doctors, physician assistants, advanced-practice registered nurses, and optometrists to testify as expert witnesses "as to etiology, diagnosis, prognosis, treatment, treatment plan, and disability" within the scope of their respective practices. The exclusion of athletic trainers from this section supports the conclusion that the legislature did not intend for them to be permitted to testify as expert witnesses "as to etiology, diagnosis, prognosis, treatment, treatment plan, and disability" under the terms set out in Code § 8.01-401.2. *See Turner v. Wexler*, 244 Va. 124, 127 (1992) ("[M]ention of a specific item in a statute implies that omitted items were not intended to be included within the scope of the statute.").

We conclude the trial court did not abuse its discretion by limiting Dr. Casa's testimony. He is not a medical doctor, the statutory definition of athletic trainer does not qualify him to testify about the prevention, recognition, evaluation, or treatment of injuries or conditions, and no explicit statutory exception allows for such testimony.

## CONCLUSION

For these reasons, we reverse the circuit court's ruling granting summary judgment. But we affirm the court's ruling on Pearman and Pierson's motion *in limine*. We remand the case to the trial court for further proceedings consistent with this opinion.

*Affirmed in part, reversed in part, and remanded.*